# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

FRANCESCA ALLEN, individually and on behalf of all others similarly situated and on behalf of the Wells Fargo & Company 401(k) Plan,

Plaintiff,

v.

Case No. _____

WELLS FARGO & COMPANY, WELLS FARGO BANK, NA, WELLS FARGO DIRECTOR OF HUMAN RESOURCES, WELLS FARGO DIRECTOR OF COMPENSATION AND BENEFITS, WELLS FARGO EMPLOYEE BENEFITS REVIEW COMMITTEE, LLOYD H. DEAN, JOHN S. CHEN, SUSAN E. ENGEL, DONALD M. JAMES, STEPHEN W. SANGER and JOHN DOES 1–30,

Defendants.

## CLASS ACTION COMPLAINT

Plaintiff, Francesca Allen ("Plaintiff"), individually and on behalf of all other similarly- situated participants in and beneficiaries of Wells Fargo & Company's 401(k) Plan (the "Class"), by her undersigned counsel, brings this class action complaint against the defendants listed herein (collectively "Defendants," as defined below), for their

violations of Sections 409 and 502 of the Employee Retirement Income Security Act

("ERISA"),[1] 29 U.S.C. §§ 1109 and 1132, alleging as follows:

## I.        NATURE OF THE ACTION

**We found that Wells Fargo's business model imposed unrealistic sales quotas that, among other things, incentivized employees to engage in highly aggressive sales practices, creating the conditions for unlawful activity. . . .**

- Michael N. Feuer, Los Angeles City Attorney

**"The fraudulent conduct occurred on a massive scale…. The gravity and breadth of the fraud that occurred at Wells Fargo cannot be pushed aside as the stray misconduct of just a few bad apples. . . . the stunning nature and scale of these practices reflects instead the consequences of a diseased orchard."**

- Richard Cordray, Director, Consumer Financial Protection Bureau

1.       Plaintiff, a Wells Fargo & Company ("Wells Fargo" or the "Company")

team member and a participant in Wells Fargo's 401(k) Plan (the "Plan"), brings this

action concerning the Plan's investments in Wells Fargo stock individually, as a

representative of the Plan and, to the extent appropriate, on behalf of a class of all Plan

participants and beneficiaries (collectively "Participants") for whose individual accounts

the Plan invested in funds that invested primarily in Wells Fargo stock from January 1,

2014 through the present (the "Class Period").

---

[1] The Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), regulates plans providing employees with certain benefits. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw,* 463 U.S. at 90. "Congress enacted ERISA to regulate comprehensively certain employee benefit plans and 'to protect the interest of participants in these plans by establishing standards of conduct, responsibility, and obligations for fiduciaries.'" *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc*., 413 F.3d 897, 906–07 (8th Cir. 2005) (citations omitted).

2.     Defendants intentionally withheld material non-public information from Plan Participants invested in Wells Fargo stock and the public at large about a criminal epidemic at Wells Fargo associated with a critical component of Wells Fargo's business model and key driver of its stock price – *i.e.*, cross-selling.  This criminal epidemic was created by Wells Fargo's senior executives, including its CEO and Chairman, through an incentive structure that encouraged and caused employees to sign up customers for unauthorized and unwanted accounts and other banking products to generate inflated share price growth.  At the same time, these senior executives sold millions of their personal Wells Fargo stock at inflated prices, earning hundreds of millions of dollars, while failing to take corrective action to protect Plan Participants.  As a result of this, as well as other conflicts of interest and fraud, Defendants violated their fiduciary duties to the Plan participants in violation of ERISA, causing no less than hundreds of millions of dollars in damages to the Plan.

3.     Since approximately 2010, Wells Fargo, through its management and thousands of its employees, has engaged in a vast, illegal scheme of secretly signing up customers for unauthorized and unwanted accounts and other banking products to generate record, albeit fabricated, share price growth.

4.     Setting unreasonably high sales quotas and threatening employees with termination if they failed to meet these quotas, Wells Fargo management encouraged, condoned and profited from thousands of its employees opening over two million unauthorized accounts.  Wells Fargo senior management, as well as its Board of Directors (the "Board of Directors" or the "Board") knew about the significant

weaknesses in the Company's internal controls and the misconduct at Wells Fargo's branch level, but consciously and knowingly allowed this systemic problem to continue so that Wells Fargo's cross-selling statistics – a key metric and the primary reason for the meteoric rise of Wells Fargo stock – remained strong.  To date, management's failures have resulted in fines of $185 million, a 12% drop in the Company's stock, stock downgrades, significant lost business (e.g., the State of California and the State of Illinois), and untold reputational damage.  Further government investigations beckon and multiple lawsuits have been filed and are expected seeking various forms of redress for the legal violations.

5.      Beginning at least in 2010, Wells Fargo management gave its branch offices unrealistic daily quotas to "cross-sell" financial products.  "Cross-selling" – the sale of multiple banking products to the same customer – is central to Wells Fargo's business model.  As customers seek to open a standard checking account, Wells Fargo employees attempt to sign the customer up for extra products and services, such as debit cards, credit cards, and online banking.  Cross-selling was promoted so aggressively at Wells Fargo that the Company's former CEO, Dick Kovacevich, created a target for each customer called the "Gr-eight initiative," meaning eight add-on products per household.  As stated in the 2014 Wells Fargo Annual Report, "Our ability to grow primary customers is important to our results because these customers have more interactions with

us, have higher cross-sell and are more than twice as profitable as non-primary customers."[2]

6.      The quotas imposed on branch office employees were so unreasonably high that many employees, at risk of being fired if they failed to meet the quotas, were compelled to "game" the system.  Thousands of Wells Fargo employees thus engaged in a variety of tactics to meet their quotas, including: (a) creating false email addresses to enroll consumers in online-banking services; (b) opening additional deposit accounts by transferring funds without authorization; (c) applying for credit card accounts without authorization, then telling customers who received cards for which they did not actually apply to destroy the cards; (d) ordering and activating debit cards using consumers' information without their knowledge or consent; (e) incorrectly informing customers that certain products were only available together with other product offerings; and (f) failing to open accounts at the requested time, instead holding out for better sales reporting periods.  To date, Wells Fargo has admitted that more than 2.1 million fake deposit and credit accounts were opened by its employees between 2011 and 2015.  But it is still unknown outside the walls of Wells Fargo how many more fraudulent accounts were actually opened.

7.      The intense pressure placed on Wells Fargo employees to hit sales quotas created perverse incentives for employees and motivated senior management to conceal the fraud.

---

[2] Wells Fargo & Company 2014 Annual Report, at 31.

8.      The goal of Wells Fargo's high pressure cross-selling strategy was to show steady quarterly growth in the opening of customer accounts, maintain the Company's industry leadership in cross-selling, and, most importantly, drive up the Company's share price.  It worked in record fashion, until the truth was finally uncovered.

9.      Indeed, impressed with Wells Fargo's (fake) account growth, investors rewarded the Company richly: from mid-2010 to September 7, 2016, the Company's share price – listed on the New York Stock Exchange as "WFC" – grew from roughly $24 to more than $50 per share.

10.     The artificially inflated stock price resulted in enormous compensation for Wells Fargo's executives.  Indeed, between 2012 and 2015, as Wells Fargo's share price soared, driven by Wells Fargo's cross-selling strategy and "successes," CEO John Stumpf has been the banking industry's highest paid CEO, receiving $155 million in stock options.  Carrie Tolstedt, the Wells Fargo executive responsible for supervising Wells Fargo's roughly 6,000 retail branches, ground zero for the bank's illegal scheme, has received total compensation over the past three years exceeding $27 million.

11.     On September 8, 2016, two federal agencies and the Los Angeles City Attorney announced the findings of their investigations and assessed penalties against Wells Fargo totaling $185 million.  The Consumer Financial Protection Bureau (the "CFPB") issued a consent order requiring Wells Fargo to pay a $100 million penalty — the highest penalty ever assessed by the regulator — and to take other remedial action. Specifically, the Office of the Comptroller of the Currency (the "OCC") issued a consent order for the assessment of a civil penalty in the amount of $35 million and a cease and

desist order, for, among other things, unsafe or unsound practices in Wells Fargo's risk management and oversight of its sales practices.  And, the City and County of Los Angeles settled their lawsuit against Wells Fargo on behalf of California, imposing a $50 million penalty – the largest in the Los Angeles City Attorney Office's history.  The reaction of Wells Fargo management was to announce, for the first time, that over the past few years, 5,300 employees had been fired for this misconduct.  Wells Fargo, however, failed to mention that internal whistleblowers over the years were railroaded, silenced, and eventually fired.  It is still unknown what other systemic problems Wells Fargo is concealing.

12.     The problem at Wells Fargo was never simply one of rogue employees at the branch level.  The Board, Defendants, and other high level Wells Fargo management, knew that this misconduct was occurring and that internal controls, if any, were inadequate but deliberately ignored the warnings of widespread problems, profited immensely from the scheme, and failed to protect Plan Participants from the inevitable fallout.

13.     Only following a scathing Senate hearing, and finally acknowledging, albeit begrudgingly, senior leadership's culpability, the Board, on September 28, 2016, announced that Wells Fargo was clawing back compensation valued at $41 million and $19 million from CEO Stumpf and Senior Executive VP Tolstedt, respectively.  In light of the Board's historic, systemic failures and the tremendous damage already wreaked on the Company, the Board's clawback is a "day late and a dollar short."

14.     Indeed, as a result of the Board, Defendants, and Wells Fargo management's ongoing failure to monitor Wells Fargo's activities, the Company has already suffered, and will continue to suffer, substantial financial and reputational damage.  Wells Fargo has lost over $20 billion in market capitalization since the regulatory penalties were announced on September 8, 2016.

15.     And, perhaps most importantly, Wells Fargo has suffered extreme reputational harm among its customers, the financial services industry, states, and the federal government, the latter of which was on vivid display during the September 20, 2016 hearing of the Senate Committee on Banking, Housing, and Urban Affairs, during which Wells Fargo CEO John Stumpf confronted outraged questioning from a bipartisan group of Senate Committee members.  Wells Fargo is also subject to further investigations, both at the federal and state level, certain of which may result in criminal indictments.

16.     Defendants, despite being aware of the Company's broad and systemic fraud scheme, ignored their duties of prudence, loyalty and competence under ERISA by failing to take any alternative actions to protect the Plan and its Participants from losses in the value of Wells Fargo stock that occurred as a result of the scheme.

17.     Defendants knew that the value of Wells Fargo stock was artificially inflated, and Defendants knew that the value of Wells Fargo stock would be negatively impacted once this non-public and non-disclosed fraud information was actually disclosed.  Defendants' failure to act prudently, loyally, and competently has resulted in

losses to the Plan and its Participants resulting from the material drop in the Company's stock price, causing not less than hundreds of millions of dollars in losses to the Plan.

18.     Wells Fargo chose to protect itself and its executives at the expense of the Plan Participants (among others).  Executives were being rewarded with millions and millions dollars of bonuses based on cross-selling "successes," further motivating the Company to continue concealing the fraudulent scheme.  Rather than correcting the fraud and promptly and accurately disclosing the fraud to customers and the marketplace, Wells Fargo continued to conceal and obfuscate for years, causing far greater damage to the Plan.

19.     In light of the foregoing (and as more fully discussed below), during the Class Period at issue it was imprudent and disloyal for Defendants to:  (a) permit the 401(k) to offer the funds primarily invested in Wells Fargo stock as investment options, particularly when portions of Plan assets automatically defaulted into Wells Fargo stock; (b) permit the Plan to invest in funds that are primarily invested in Wells Fargo stock; and (c) permit the Plan funds to invest in, and remain invested in, Wells Fargo stock, because it was reasonably foreseeable that the broad and systemic fraud, and the cover-up, would, among other things, adversely affect the Company's stock price.

20.     Defendants allowed the imprudent and disloyal investment of the Plan's assets in funds invested in Wells Fargo stock throughout the Class Period despite the fact that Defendants possessed non-public, material information bearing adversely on the Plan's continued investment in Wells Fargo stock.  Defendants knew that Wells Fargo was perpetrating a broad and systemic fraud scheme in its Banking and Retail divisions

and failed to take any helpful steps to protect the Plan and/or Plan Participants from the reasonably foreseeable monetary losses directly attributable to the scheme. Defendants were too blinded by short-term greed to acknowledge the obvious risk that covering up the fraud, by firing whistleblowers and failing to disclose any of the salient facts to the marketplace for several years, would have an even more devastating impact on Wells Fargo's reputation and stock price.

21. A prudent and loyal fiduciary would have recognized that as a consequence of the ongoing fraud, systematic cover-up, and then eventual disclosure of the broad and systemic fraudulent scheme, the Plan's significant investment of employees' retirement savings in Wells Fargo stock would inevitably result in devastating losses to the Plan, and consequently, to the Plan Participants.

22. Because Plaintiff's claims apply to the Plan, inclusive of all Participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes Participants such as Plaintiff to sue for relief for the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this lawsuit on behalf of the Plan and all Participants and beneficiaries of the Plan during the proposed Class Period.

23. As more fully discussed below, Defendants breached their fiduciary duties owed to the Plan and Plan Participants, including those fiduciary duties set forth in ERISA § 404, 29

U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550.  As a result of these breaches, Defendants are liable to the Plan for all losses resulting from each such breach of fiduciary duty.  Plaintiff also seeks equitable relief.

## II.     JURISDICTION AND VENUE

24.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that Participants in an employee retirement plan may pursue a civil action on behalf of the Plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

25.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

26.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), pursuant to a forum selection clause, Section 1.4 of the January 1, 2010 Amended and Restated Wells Fargo 401(k) Plan document,[3] and based on information and belief, because this is the district where the Plan is administered and where breaches of fiduciary duties giving rise to this action occurred.

## III.     PARTIES

### *Plaintiff*

27.     Francesca Allen is a Plan Participant, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held (and continues to hold) Wells Fargo shares in her

---

[3] "All controversies, disputes, and claims arising hereunder shall be submitted to the United States District Court for the District of Minnesota, except as otherwise provided in the Trust Agreement."

retirement investment portfolio during the Class Period.  From at least 2013 through the

present, Ms. Allen's 401(k) plan assets have included the Wells Fargo ESOP and Non-

ESOP Funds.

***Defendants***

        **A.**    ***Wells Fargo & Company***

28.    Wells Fargo & Company is the Plan "sponsor" within the meaning of 29

U.S.C. § 1002(16)(B), and is a participating employer in the Plan.  Wells Fargo provides

the funding for the Plan.  According to the Wells Fargo Summary Plan Description,

"[t]he investment options offered within the 401(k) Plan are monitored and reviewed

periodically by the Wells Fargo Employee Benefits Review Committee (EBRC)."[4]

29.    Wells Fargo & Company, by action of its Board of Directors, by action of

the Human Resources Committee of the Board of Directors, the Director of Human

Resources, the Director of Compensation and Benefits, or by action of a person so

authorized by resolution of the Board of Directors or the Human Resources Committee,

may amend the 401(k) Plan at any time.

30.    On information and belief, through its selection, management and

supervision of the EBRC, Wells Fargo exercises discretionary authority or discretionary

control respecting management of the Plan, as well as discretionary authority and

responsibility with respect to the administration of the Plan, and is therefore a fiduciary

under 29 U.S.C. § 1002(21)(A).

---

[4]https://teamworks.wellsfargo.com/benefitsbookspd/2014/1047712__201303047__401k_SPD_accessible.pdf.

**B.**     ***Director of Human Resources and Director of Compensation and Benefits***

31.     The Plan Administrators are the Wells Fargo Director of Human Resources and the Wells Fargo Director of Compensation and Benefits.  The Plan administrators have full discretionary authority to administer and interpret the 401(k) Plan and, consequently, are fiduciaries pursuant to 29 U.S.C. § 1002(21)(A).

**C.**     ***Wells Fargo Bank, NA***

32.     Wells Fargo Bank, NA is the Plan Trustee and a fiduciary pursuant to 29 U.S.C. § 1002(21)(A).

**D.**     ***Wells Fargo Employee Benefits Review Committee***

33.     As stated above, according to the Wells Fargo Summary Plan Description, "[t]he investment options offered within the 401(k) Plan are monitored and reviewed periodically by the Wells Fargo Employee Benefits Review Committee ("EBRC")."  The Committee is therefore a fiduciary pursuant to 29 U.S.C. § 1002(21)(A).

34.     According to Wells Fargo's annual reports, "several members of senior management" preside over the Wells Fargo EBRC.

**E.**     ***Human Resource Committee***

35.     The members of the Board's Human Resources Committee ("HRC") are Lloyd H. Dean, John S. Chen, Susan E. Engel, Donald M. James, and Stephen W. Sanger.  According to the Human Resources Committee Charter, the purpose of the Human Resources Committee is to assist the Board "in fulfilling its responsibilities relating to the overall compensation strategy for the Company and the compensation of

the Company's executive officers."  Significantly, the Human Resources Committee is explicitly tasked with overseeing "the implementation of risk-balancing and risk management methodologies for incentive compensation plans and programs for senior executives and those identified employees in a position to expose the Company to material risk."  The Human Resources Committee Charter ("HRC") further states, in pertinent part, that:

- The HRC shall establish, in consultation with senior management, the overall strategy for the Company with respect to incentive compensation and shall oversee the Company's incentive compensation practices to help ensure that they are consistent with the safety and soundness of the Company and do not encourage excessive risk-taking. For this purpose the HRC shall review and monitor risk-balancing and implementation and effectiveness of risk management methodologies relating to incentive compensation plans and programs for senior executives and those identified employees in positions to expose the Company to material risk;

- The [Human Resources Committee] shall make recommendations to the Board with respect to the Company's incentive compensation and equity-based plans that are subject to Board approval, discharge any responsibilities assigned to the [Human Resources Committee] by any of these plans, and periodically review the Company's stock ownership retention guidelines for participants in the Company's Long-Term Incentive Compensation Plan.

36.    Wells Fargo's 2016 Annual Proxy further reiterates the Human Resources Committee's primary responsibilities in both establishing the Company's incentive compensation policies and monitoring any risk exposure created from such policies. According to the 2016 Annual Proxy, the Human Resources Committee:

- Discharges the Board's responsibilities relating to the Company's overall compensation strategy and the compensation of our executive officers;

- Oversees the Company's incentive compensation practices so that they are consistent with the safety and soundness of the Company and do not encourage excessive risk-taking and reviews and approves benefit and compensation plans and arrangements applicable to executive officers of the Company;

- Evaluates the CEO's performance and approves and recommends the CEO's compensation to our Board for ratification and approval and approves compensation for our other executive officers and any other officers or employees as the HRC determines appropriate; and

- Has the sole authority to retain or obtain the advice of and terminate any compensation consultant, independent legal counsel or other advisor to the HRC, and evaluates the independence of its advisors in accordance with NYSE rules.

37.    To the extent the named Defendants possessed the authority to delegate their fiduciary responsibilities, any individual or entity to whom these Defendants delegated any of their fiduciary functions or responsibilities are also fiduciaries of the Plan pursuant to 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2).  Because the individuals and/or entities that have been delegated fiduciary responsibilities are not currently known to the Plaintiff, they are collectively named as John Does 1-30.

38.    Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)-(3) because she, he or it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its breaches and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## IV.    THE PLAN

39.    The Plan was established in 1953 and was restated multiple times, including in 2010.

40.     The Plan is a defined contribution benefit plan that is sponsored by Wells Fargo and available to eligible employees of Wells Fargo and its subsidiaries. All contributions to the Plan are held in the 401(k) Plan Trust.

41.     The Plan is tax qualified under the Internal Revenue Code as both an employee stock ownership plan and as a 401(k) qualified cash or deferred arrangement.

42.     At all relevant times to this Complaint, the Plan was a "defined contribution" or "individual account" plan within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.  As such, the Plan is subject to ERISA.

43.     An eligible employee can make salary deferral contributions to the Plan. Salary deferral contributions to the Plan are made from certified compensation earned during the entire pay period containing the date in which the employee salary deferral election is effective.

44.     The Plan has more than 350,000 Participants and contains total assets of approximately $35 billion.

45.     For the 2013 investment year, the investment options for Plan Participants were:  Wells Fargo Dow Jones Target Today Fund, Wells Fargo Dow Jones Target 2010 Fund, Wells Fargo Dow Jones Target 2015 Fund, Wells Fargo Dow Jones Target 2020 Fund, Wells Fargo Dow Jones Target 2025 Fund, Wells Fargo Dow Jones Target 2030

Fund, Wells Fargo Dow Jones Target 2035 Fund, Wells Fargo Dow Jones Target 2040 Fund, Wells Fargo Dow Jones Target 2045 Fund, Wells Fargo Dow Jones Target 2050 Fund, Wells Fargo Dow Jones Target 2055 Fund, 100% Treasury Money Market Fund, Wells Fargo Stable Value Fund, U.S. Bond Index Fund, PIMCO Global Advantage Strategy Bond Fund, Large Cap Value Fund, S&P 500 Index Fund, Large Cap Growth Fund, S&P Mid Cap Index Fund, Russell Small Cap Index Fund, Small Cap Fund, International Index Fund, Emerging Markets Equity Fund, NASDAQ 100 Index Fund, Wells Fargo ESOP Fund, and Wells Fargo Non-ESOP Fund.

46.     For the 2014 investment year, the investment options for Plan Participants were:  Wells Fargo Target Today Fund, Wells Fargo Target 2010 Fund, Wells Fargo Target 2015 Fund, Wells Fargo Target 2020 Fund, Wells Fargo Target 2025 Fund, Wells Fargo Target 2030 Fund, Wells Fargo Target 2035 Fund, Wells Fargo Target 2040 Fund, Wells Fargo Target 2045 Fund, Wells Fargo Target 2050 Fund Target Wells Fargo, 2055 Fund, Wells Fargo Advantage 100% Treasury Money Market Fund, Wells Fargo Stable Value Fund, SSgA U.S. Bond Index Fund, PIMCO Global Advantage Strategy Bond Fund, Large Cap Value Fund, SSgA S&P 500 Index Fund, Large Cap Growth Fund, SSgA S&P Mid Cap Index Fund, SSgA Russell Small Cap Index Fund, Small Cap Fund, SSgA International Index Fund, International Equity Fund, Lazard/Wilmington Emerging Markets Equity Fund, SSgA NASDAQ 100 Index Fund, Wells Fargo ESOP Fund, and Wells Fargo Non-ESOP Fund.

47.     For the 2015 investment year, the investment options for Plan Participants were: Wells Fargo Dow Jones Target Today Fund, Wells Fargo Dow Jones Target 2010

Fund, Wells Fargo Dow Jones Target 2015 Fund, Wells Fargo Dow Jones Target 2020 Fund, Wells Fargo Dow Jones Target 2025 Fund, Wells Fargo Dow Jones Target 2030 Fund, Wells Fargo Dow Jones Target 2035 Fund, Wells Fargo Dow Jones Target 2040 Fund, Wells Fargo Dow Jones Target 2045 Fund, Wells Fargo Dow Jones Target 2050 Fund, Wells Fargo Dow Jones Target 2055 Fund, Wells Fargo 100% Treasury Money Market Fund, Wells Fargo Stable Value Fund, U.S. Bond Index Fund, PIMCO Global Advantage Strategy Bond Fund Institutional, Large Cap Value Fund, S&P 500 Index Fund Large Cap Growth Fund, S&P Mid Cap Index Fund, Russell Small Cap Index Fund, Small Cap Fund, NASDAQ 100 Index Fund, International Index Fund, Emerging Markets Equity Fund, Wells Fargo ESOP Fund, and Wells Fargo Non-ESOP Fund.

48. For the 2016 investment year, the investment options for Plan Participants were: Wells Fargo Dow Jones Target Today Fund, Wells Fargo Dow Jones Target 2010 Fund, Wells Fargo Dow Jones Target 2015 Fund, Wells Fargo Dow Jones Target 2020 Fund, Wells Fargo Dow Jones Target 2025 Fund, Wells Fargo Dow Jones Target 2030 Fund, Wells Fargo Dow Jones Target 2035 Fund, Wells Fargo Dow Jones Target 2040 Fund, Wells Fargo Dow Jones Target 2045 Fund, Wells Fargo Dow Jones Target 2050 Fund, Wells Fargo Dow Jones Target 2055 Fund, Wells Fargo 100% Treasury Money Market Fund, Wells Fargo Stable Value Fund, U.S. Bond Index Fund, PIMCO Global Advantage Strategy Bond Fund Institutional, Large Value Fund, S&P 500 Index Fund Large Cap Growth Fund, S&P Mid Cap Index Fund, Russell Small Cap Index Fund, Small Cap Fund, NASDAQ 100 Index Fund, International Index Fund, Emerging Markets Equity Fund, Wells Fargo ESOP Fund, and Wells Fargo Non-ESOP Fund.

49.     Participants are also eligible to receive employer matching and employer discretionary profit sharing contributions.

50.     *All* matching contributions of the Plan are invested automatically in Wells Fargo stock.

### Wells Fargo ESOP Fund

51.     Participant contributions to the Plan's ESOP Fund are invested primarily in Wells Fargo common stock and such participation is available exclusively to Plan Participants.

52.     Dividends on the ESOP may be distributed or passed through to Participants who are invested in the ESOP Fund.

### Wells Fargo Non-ESOP Fund

53.     Participant contributions to the Plan's Non-ESOP Fund are invested primarily in Wells Fargo common stock and such participation is available exclusively to Participants in the Plan.

54.     Due to certain Internal Revenue Code regulations, dividends declared or paid on Participants' account balances in the Non-ESOP Fund are reinvested within the Fund.

## V.     DEFENDANTS WERE FIDUCIARIES

55.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

56.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

57.     Each of the Defendants was a fiduciary during the Class Period as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) -- either as a named fiduciary or de facto fiduciary -- with respect to the Plan and owed fiduciary duties to the Plan and their Participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

## VI.     DEFENDANTS' FIDUCIARY DUTIES

58.     ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by

diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

59.     The Duty of Loyalty: ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."  ERISA § 404(a)(1)(A).

60.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

61.     The Duty of Prudence: ERISA also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."  ERISA § 404(a)(1)(B).

62.     Wells Fargo recognizes these duties explicitly in its 401(k) Plan documents. For example, in its October 1, 2013 Summary Plan Description, it informs Plan Participants: "In addition to creating rights for plan participants, ERISA imposes duties on people who are responsible for the operation of the team member benefits plan. The people who operate the 401(k) Plan, called "fiduciaries" of the 401(k) Plan, have a duty

to do so prudently and in the interest of you and other 401(k) Plan participants and beneficiaries."

63.     <u>The Duty to Investigate and Monitor Investment Alternatives</u>: With respect to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan including employer securities, to ensure that each investment is a suitable option for the Plan.

64.     <u>The Duty to Monitor Appointed Fiduciaries</u>: Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.  In a 401(k) plan such as the Plan, the monitoring fiduciaries must ensure that the appointed fiduciaries:

      (a)    possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

      (b)    are knowledgeable about the operations of the plan, the goals of the plan, and the behavior of plan's participants;

      (c)    are provided with adequate financial resources to do their jobs;

      (d)    have adequate information to do their jobs of overseeing the plan investments with respect to company stock;

      (e)    have access to outside, impartial advisors when needed;

      (f)    maintain adequate records of the information on which they base their decisions and analysis with respect to the plan's investment options; and

      (g)    report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

65.     <u>The Duty to Disregard Plan Documents, if Required</u>: A fiduciary may not avoid its fiduciary responsibilities by relying solely on the language of the Plan documents.

While the basic structure of a Plan may be specified, within limits, by the Plan sponsor, the fiduciary may not blindly follow the Plan document if to do so leads to an imprudent result.

ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

66.     <u>Co-Fiduciary Liability</u>: A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

67.   <u>Non-Fiduciary Liability</u>: Under ERISA, non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## VII.   FACTUAL ALLEGATIONS

### A.   WELLS FARGO'S EMPLOYEES FRAUDULENTLY OPEN CUSTOMER ACCOUNTS

68.   With $1.5 trillion in assets, Wells Fargo is one of the nation's largest financial services companies.  Wells Fargo provides banking, insurance, investments, mortgage, and consumer and commercial financing services through more than 6,000 retail banking stores, 13,000 ATMs, and the Internet.  The Company was listed 27th on Fortune Magazine's 2016 rankings of America's 500 largest corporations.

69.   Attempting to cultivate a reputation as "the good bank," and emerging largely unscathed from the financial crisis of 2008-2009, Wells Fargo executives have maintained that Wells Fargo steers clear of high risk investments, focusing instead on traditional banking with high ethical standards**.**

70.   As touted by Wells Fargo in its document titled "Vision and Values of Wells Fargo,"[5] Wells Fargo's focus on the customer-oriented "good bank" reputation is a Company-wide strategy:

- ▪ "Customer-centric, not product-centric: Our strategy is not product-centric it's customer-centric…"

- ▪ "Our job: provide sound financial advice for customers—and create new wealth for them—as they move from one financial product to another. If

---

[5] Wells Fargo, The Vision and Values of Wells Fargo, *available at* http://goodbadstrategy.com/wp-content/downloads/VisionValuesOfWellsFargo.pdf.

we do what's right for the customer, then it will be right for Wells
Fargo. We focus not on products but on customer needs. For example,
our job is not to sell mortgages. It's to help our customers buy homes.
Our job is not to sell mutual funds or annuities or 401(k) plans, it is to
help our customers save for retirement, pay for their children's college
education, or start a new business."

71.     As now known, however, far from being "the good bank," Wells Fargo

management for at least five years imposed an extremely aggressive sales program on its

branch employees that resulted in those branch employees engaging in unlawful and

unethical behavior, including creating false accounts, to meet those unrealistic goals.

72.     In an effort to boost revenues and inflate its stock price, dating back to at

least 2010, Wells Fargo management imposed on its branch offices daily quotas to

"cross-sell" financial products to existing customers.  For example, if a customer had a

checking account, Wells Fargo employees were pressured to sign that customer up for a

savings account, a credit or debit card, online banking services, and other related

products.  The Company's former CEO, Dick Kovacevich, created a target of eight add-

on products per household, dubbing it the "Gr-eight initiative."  Cross-selling's rationale

is simple: rather than spend too much time and money recruiting new customers, Wells

Fargo concentrates on selling new products to existing customers.  But taken to its

extreme, as Wells Fargo did, the practice can lead to abusive sales practices.

73.     Wells Fargo management consistently coerced and threatened employees to

meet these unreasonable quotas.  Employees who missed sales quotas were forced to stay

late or work weekends to catch up.  They were also threatened with termination.

Regional managers would also stay late to achieve the sales quotas.  These efforts were all unpaid.

74.     Wells Fargo's sales quotas were generally unattainable simply because not enough customers entered bank branches on a daily basis.  Thousands of Wells Fargo employees faced a Hobson's choice: fail to meet the quotas and risk losing their jobs or try to meet their quotas through alternative, less ethical means.  In order to keep their jobs and support their families, some employees succumbed to the overwhelming pressure and resorted to opening accounts without customer consent, using inaccurate or misleading information about potential accounts to induce customers to open them, and engaging in other high-pressure sales tactics to coerce customers into opening additional accounts.

75.     A common tactic involved creating a false deposit account by moving a small amount of money from the customer's existing Wells Fargo account to open a new one. In this scenario, the Wells Fargo internal systems would give the employee credit toward her sales goals for opening a new account, and the accounts would often, in turn, generate fees for Wells Fargo.

76.     Another common tactic involved applying for credit card accounts without customer authorization.  When customers later complained about receiving cards they did not request, they were advised to simply destroy the unrequested and unauthorized cards.  At other times, Wells Fargo employees would advise customers who did not want credit cards that they would be sent a credit card anyway, and instruct them to simply tear up the credit card when they receive it.  But destroying the unauthorized cards did not close the account or repair the impact to a customer's credit profile.  Customers' credit reports

were often negatively affected, and customers were sometimes forced to purchase costly identity theft protection services to protect against further fraudulent activity.

77.     Another practice was known as "pinning," in which a Wells Fargo banker obtained a customer's debit card number and set the PIN (often to 0000) without customer authorization.  Pinning allowed a banker to enroll a customer in online banking, for which the employee received a sales credit.  In order to bypass computer prompts requiring customer contact information, bankers would impersonate the customer online and input false generic email addresses, such as noname@wellsfargo.com to ensure that the transaction was completed and that the customer was not alerted to the activity.

78.     Another practice, known as "bundling," involved sales personnel telling customers that the account they legitimately sought to open could be obtained only with the purchase of additional accounts or products, when the desired product was actually available on its own.  Employees were coached by management to lie to customers by telling them that each checking account automatically comes with a savings account, credit card, or other products.

79.     Yet another practice, known at Wells Fargo as "sandbagging," involved a banker delaying the opening of a new account or processing a sale (without knowledge of the account holder) until a time that was most beneficial to Wells Fargo or the employee, such as when a new sales reporting period commenced.  New Year's Day was an especially common date to open "sandbagged" accounts because of the Company's "Jump into January" sales program.  This program required bankers to meet even more aggressive sales goals than usual, which encouraged bankers to hold onto, or not process,

new accounts or other requests until January 1.  When customers inquired why an account had not been opened promptly, they were given false explanations, such as a "technical problem" or an oversight that would be corrected eventually.  Sandbagging allowed Wells Fargo management to report inflated first quarter sales.

80.     Wells Fargo employees engaged in a variety of other tactics as well.  They would misrepresent to potential customers that they would incur a monthly fee on their checking account unless they opened a savings account, when this was not the case.  Wells Fargo employees would also misrepresent that additional accounts did not have monthly fees when, in fact, they did.  Wells Fargo would then withdraw money from customers' authorized accounts to pay the fees assessed by Wells Fargo on unauthorized accounts opened in the customers' names.  In some cases, Wells Fargo referred unauthorized, and thus unfunded, accounts to collections agencies because the accounts had negative balances.

81.     Some customers noticed the deception when they received credit or debit cards they did not request, when they were charged unexpected fees, or when they started hearing from debt collectors about accounts they did not recognize.  But, in most cases, the fake accounts went unnoticed by the customers.

82.     After news of the scandal broke on September 8, 2016, a number of Wells Fargo employees commented on their experiences working at the bank.  A *New York Post* article contained these revealing comments allegedly posted by former Wells Fargo employees, noting that the Company's high pressure sales environment dated back to at least 2004:

- "Doing the stuff [the bank] got popped for was a known secret, and damned near everyone did it."

- "No one cared to fix the problems. The final straw was knowing I was doing stuff the right way and could never match the numbers of the people that were doing stuff the wrong way and got promoted past me."

- "I was there from 2004 and if you didn't game, you didn't eat."

- "The people [CEO John Stumpf] has put in place helped further the issue they are dealing with now of a culture of dishonesty and screwing customers."[6]

83.     Wells Fargo itself has concluded that its employees opened at least 1.5 million deposit accounts and submitted applications for at least 500,000 credit-card accounts without authorization to do so during the period of 2011-2015.[7]  Wells Fargo has only recently announced that it will begin to review similar conduct prior to 2011.

## B.     CROSS-SELLING IS WELLS FARGO'S MOST IMPORTANT STRATEGY

84.     Cross-selling lies at the heart of Wells Fargo's long-term strategy.  Former Chairman and CEO Richard Kovacevich put it this way: "Cross-Selling—or what we call 'needs-based' selling—is our most important strategy.  Why? Because it is an 'increasing returns' business model."   Wells Fargo's Vision and Values Statement also identifies cross-selling as "our most important strategy."  As noted in a June 2010 Bloomberg story titled "Wells Fargo Pushes Cross-Sales to Replace Lost Growth," "Cross-selling is so

---

[6] "Ex-Wells Fargo employees challenge CEO's fraud denial," Kevin Duggan, *New York Post*, September 15, 2016, *available at* http://nypost.com/2016/09/15/ex-wells-fargo-employees-challenge-ceos-fraud-denial/.

[7] From the CFPB Consent Order: "Respondent's analysis concluded that its employees opened 1,534,280 deposit accounts . . . Respondent's analysis concluded that its employees submitted applications for 565,443 credit-card accounts that may not have been authorized."

central to Wells Fargo that managers mentioned it 108 times at last month's two-day investor conference."[8]

85.    The ultimate goal of Wells Fargo's high pressure cross-selling strategy was to show steady quarterly growth to investors.  The multiple accounts held by many Wells Fargo customers signaled to Wall Street that the Company maintained deep relationships with its customers, meaning the Company would continue making money from them. Investors in banks equate growth in cross-selling and growth in the customer base to growth in earnings, and from mid-2010 to just before September 8, 2016, the Company's share price grew from roughly $24 to $50.56 – a 111% increase.

86.    Cross-selling is such an integral part of the Company's business model that it is discussed repeatedly in Wells Fargo's filings with the Securities and Exchange Commission and in the Company's Annual Reports.  For example, in its 2013 Annual Report, Wells Fargo touted its cross-selling strategy noting, "Our retail bank household cross-sell was a record 6.16 products per household in November 2013, up from 6.05 in November 2012 and 5.93 in November 2011.  We believe there is more opportunity to cross-sell as we continue to earn more business from our customers.  Our goal is eight products per household. . ."[9]

87.    Wells Fargo even portrayed its cross-selling strategy to its investors as one that would be profitable even in "weak" economic cycles.  Specifically, in its 2013

---

[8] "Wells Fargo Pushes Cross-Sales to Replace Lost Growth," by David Henry and Dakin Campbell, *available at* http://www.bloomberg.com/news/articles/2010-06-22/wells-fargo-says-eight-is-great-as-banks-cross-sell-to-replace-lost-growth.

[9] Wells Fargo & Company 2013 Annual Report at 44.

Annual Report Wells Fargo notes, "Our cross-sell strategy, diversified business model and the breadth of our geographic reach facilitates growth in both strong and weak economic cycles.  We can grow by expanding the number of products our current customers have with us, gain new customers in our extended markets, and increase market share in many businesses."[10]

88.    Wells Fargo's Annual Reports are replete with similar examples (emphasis added):

**2010 Annual Report**

- "**Community Banking: Cross-sell milestone:** If anyone tells you it's easy to earn more business from current customers in financial services, don't believe them. We should know. We've been at it almost a quarter century. **We've been called, true or not, the "king of cross-sell."**[11]

- "Our ability to grow revenue and earnings will suffer if we are unable to sell more products to customers. Selling more products to our customers – "cross-selling" – is very important to our business model and key to our ability to grow revenue and earnings. Many of our competitors also focus on cross-selling, especially in retail banking and mortgage lending. This can limit our ability to sell more products to our customers or influence us to sell our products at lower prices, reducing our net interest income and revenue from our fee-based products. It could also affect our ability to keep existing customers. New technologies could require us to spend more to modify or adapt our products to attract and retain customers. Increasing our cross-sell ratio – or the average number of products sold to existing customers – may become more challenging and we might not attain our goal of selling an average of eight products to each customer."[12]

**2011 Annual Report**

- "Negative public opinion could result from our actual or alleged conduct in

---

[10] *Id.* at 30.

[11] Wells Fargo & Company 2010 Annual Report at 5-6.

[12] *Id.* at 98 (in the Risk Factors section).

any number of activities, including mortgage lending practices, servicing and foreclosure activities, corporate governance, regulatory compliance, mergers and acquisitions, and disclosure, sharing or inadequate protection of customer information, and from actions taken by government regulators and community or other organizations in response to that conduct. Because we conduct most of our businesses under the "Wells Fargo" brand, negative public opinion about one business could affect our other businesses and also could negatively affect our "cross-sell" strategy."[13]

## 2012 Annual Report

- "Cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs. Our retail bank household cross-sell was 6.05 products per household in fourth quarter 2012, up from 5.93 a year ago. We believe there is more opportunity for cross-sell as we continue to earn more business from our customers. Our goal is eight products per customer, which is approximately half of our estimate of potential demand for an average U.S. household. In fourth quarter 2012, one of every four of our retail banking households had eight or more of our products."[14]

## 2013 Annual Report

- "Cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs."[15]

## 2014 Annual Report

- "Our ability to grow primary customers is important to our results because these customers have more interactions with us, have higher cross-sell and are more than twice as profitable as non-primary customers."[16]

## 2015 Annual Report

- "We aspire to create deep and enduring relationships with our customers by providing them with an exceptional experience and by discovering their

---

[13] Wells Fargo & Company 2011 Annual Report at 108 (in the Risk Factors section).

[14] Wells Fargo & Company 2012 Annual Report at 44.

[15] Wells Fargo & Company 2013 Annual Report at 44.

[16] Wells Fargo & Company 2014 Annual Report at 31.

needs and delivering the most relevant products, services, advice, and guidance. An outcome of offering customers the products and services they need, want and value is that we earn more opportunities to serve them, or what we call cross-sell. Cross-sell is the result of serving our customers well, understanding their financial needs and goals over their lifetimes, and ensuring we innovate our products, services and channels so that we earn more of their business and help them succeed financially. Our approach to cross-sell is needs-based as some customers will benefit from more products, and some may need fewer. We believe there is continued opportunity to meet our customers' financial needs as we build lifelong relationships with them. One way we track the degree to which we are satisfying our customers' financial needs is through our cross-sell metrics, which are based on whether the customer is a retail banking household or has a wholesale banking relationship."[17]

89.     The positive trend in the cross-sell results touted in these Annual Reports coincides with the positively trending Company stock price throughout the Class Period.

90.     The artificially inflated stock price achieved by these reports, coupled with the failure to disclose the fraudulent schemes underlying the cross-selling strategy, resulted in enormous compensation for the Company's executives.  CEO John Stumpf received over $121 million in compensation between 2010 and 2015 as Wells Fargo's share price soared, in large part based on the cross-selling strategy.  In 2015, Stumpf was ranked as one of the banking industry's highest paid CEOs, having earned more than $18 million that year.[18]

### C.     WELLS FARGO INCENTIVIZED EXECUTIVE MISCONDUCT

91.     As a result of the widespread illegal practices described herein, the Company has fired roughly 5,300 employees and managers, with one notable exception:

---

[17] Wells Fargo & Company 2015 Annual Report at 46.

[18] *See* http://www.bizjournals.com/philadelphia/news/2016/06/29/sandp-highest-paid-bank-ceo-investors-cummings.html.

Carrie Tolstedt, the executive in charge of Wells Fargo's Community Banking Division. As head of the Community Banking Division throughout the time of the fraudulent conduct alleged herein, Tolstedt was charged with supervising the roughly 6,000 retail branches where the fraudulent conduct occurred.  On July 12, 2016, just weeks before Wells Fargo's misconduct was publicly revealed, Defendant Tolstedt announced her intent to step down from her managerial role at the Company's Community Banking Division effective July 31, 2016 and retire from the Company at year's end.  As described in detail above, Wells Fargo was well aware of the problems in the Community Banking Division at that point.

92.     One of Tolstedt's biggest achievements during her tenure at Wells Fargo was the expansion of multiple accounts held by Wells Fargo's customers.  These "strong cross-sell ratios" were a major factor behind Tolstedt's exorbitant compensation.  For instance, Tolstedt's total pay in 2015 was approximately $9 million, a reward for "continued growth in primary checking customers" and other metrics.  Her total compensation over the past three years exceeded $27 million.  Until the Board changed course after recent public outcry, Tolstedt was also expected to receive up to $124 million when she retired at the end of the year through a combination of shares, options and restricted stock.[19]

93.     Notwithstanding the widespread misconduct under Tolstedt's supervision, Wells Fargo gave her a hero's farewell.  Stumpf called Tolstedt a "role model for

---

[19] The $124 million figure is based on the Company's stock price on September 13, 2016.

responsible leadership" and "a standard-bearer of our culture."[20]   Remarkably, Tolstedt was scheduled to remain at Wells Fargo through the end of the year, and her compensation had been unaffected despite the rampant misconduct of Wells Fargo employees on her watch.   Lower and midlevel employees have faced steep repercussions, including termination, while senior executives' stock awards and exorbitant compensation have remained intact.   Even after the massive fraud was finally revealed to the public, Stumpf defended Tolstedt to the Senate Banking Committee and confirmed that she had not been fired.

94.     No longer able to defend the failures of its senior leadership amidst public outrage, on September 28, 2016, Wells Fargo's Board announced that the Company was clawing back compensation valued at $41 million and $19 million, respectively, from CEO Stumpf and Senior Executive VP Tolstedt in light of the scandal.   Unsurprisingly, given the Board's long-ongoing oversight failures and the devastating damage already inflicted on the Company, reaction to the announcement was as dismissive as it was swift:   "The bank already waited too long to start sanctioning top executives . . . 'It's a dollar short and a day late.'"[21]   Indeed, by that time, management-level employees had already been richly rewarded with robust compensation, bonuses, and stock options for many years for perpetuating the fraudulent cross-selling scheme at the expense of customers, shareholders, and lower-level employees.

---

[20] Wells Fargo News Release, July 12, 2016, *available at* https://www.wellsfargo.com/about/press/2016/tolstedt-to-retire_0712.content.

[21] "Wells Fargo's CEO Forfeits $41 Million in Fight to Keep Job," Bloomberg, Sept. 28, 2016, *available at* http://www.bloomberg.com/news/articles/2016-09-27/wells-fargo-ceo-forfeits-more-than-41-million-amid-board-review.

**D.     WELLS FARGO IS FINED $185 MILLION AND IS HARSHLY CRITICIZED BY FEDERAL AND STATE OFFICIALS**

95.     On September 8, 2016, federal banking regulators announced that Wells Fargo had been fined $185 million for a host of illegal banking practices, including a $100 million penalty from the CFPB (the largest penalty in the history of that agency), $35 million by the OCC, and $50 million by the City of Los Angeles (the largest such penalty in the history of the City Attorney's office).

96.     In a news conference announcing the penalties, regulators said that Wells Fargo employees opened roughly 1.5 million bank accounts and applied for 565,000 credit cards that may not have been authorized by customers in the 2011-2015 timeframe. The regulators stated that these practices reflected serious flaws in the internal culture and oversight at Wells Fargo.  "Unchecked incentives can lead to serious consumer harm, and that is what happened here," said Richard Cordray, director of the CFPB.  "The gravity and breadth of the fraud that occurred at Wells Fargo cannot be pushed aside as the stray misconduct of just a few bad apples," he went on, "the stunning nature and scale of these practices reflects instead the consequences of a diseased orchard."[22]

97.     Lawmakers throughout the government delivered stinging criticisms of the Company, with Senator Elizabeth Warren at the forefront, describing Wells Fargo's behavior as a "staggering fraud."  Treasury Secretary Jack Lew commented, "The pattern of behavior that we've seen here is something that needs to stop. It is not acceptable to do things that are designed to increase either an individual or firm's bottom line by

---

[22] *See* "Wells Fargo Fined $185 Million for Fraudulently Opening Accounts," Michael Corkery, *The New York Times*, Sept. 8, 2016.

deceiving customers or passing on charges that are either invisible or they don't know about."[23]  Comptroller of the Currency Thomas Curry echoed these sentiments, stating, "These practices … undermine the fundamental trust that goes to the heart of the bank-customer relationship.  They are unacceptable and have no place in the federal banking system."[24]

98.     On September 20, 2016, the Senate Committee on Banking, Housing, and Urban Affairs held a hearing on the matter (the "Senate Hearing"), and Committee members from both parties lambasted Stumpf and the Company.  Below are just a few of the quotes the Senators directed at Stumpf:

- Senator Elizabeth Warren: "You squeezed your employees to the breaking point so you could cheat customers and drive up the value of your stock. And when it all blew up, you kept your job, your multi-million dollar bonuses, and went on TV and blamed thousands of $12-an-hour employees trying to meet cross-sell quotas. You should resign. You should be criminally investigated by the Department of Justice and Securities and Exchange Commission."

- Senator Pat Toomey: "Wells Fargo wasn't cross-selling. Failing to notify these customers about these sham accounts, this isn't cross-selling, this is fraud."

- Senator Toomey: "You state unequivocally that there are no orchestrated effort or scheme [sic], as some have called it, by the company.  But when thousands of people conduct the same kind of fraudulent activity, it's a stretch to believe that every one of them independently conjured up this idea of how they would commit this fraud."

- Senator Warren: "You keep saying, 'The board, the board,' as if they're strangers you met in a dark alley . . . . You are not passive here.  If you

---

[23] *See* "Treasury Secretary Jack Lew: What Wells Fargo did was 'unacceptable,'" Maggi McGrath, *Forbes*, Sept. 13. 2016.

[24] "Oral Statement of Thomas J. Curry Comptroller of the Currency before the Committee on Banking, Housing, and Urban Affairs," Sept. 20, 2016.

have nothing to do, then what are you doing serving as chairman of the board? If you have no opinion on the most massive fraud to hit this bank since the beginning of time, how do you get to continue getting a check as chairman of the board?"

- Senator Sherrod Brown: "You would think the lessons of the financial crisis, which came at such a high cost to our country, would change the way banks do business."

99.   After the hearing, the criticism continued.  Ed Mierzwinski, consumer program director at the U.S. Public Interest Research Group, said Stumpf's apology was not enough to contain the scandal.  "I think the CEO of Wells Fargo failed to disprove that it was a massive fraud," said Mierzwinski, who attended the hearing. "No senator believed him."[25]

100.   On September 29, 2016 the U.S. House of Representatives Financial Services Committee held a hearing on the matter, during which Rep. Brad Sherman (D-CA) criticized Stumpf for both the Company's refusal to end the practice of forced arbitration, which bars customers from having their day in court for illegal practices that are levied upon them, and also for Stumpf's position that the non-disclosed information relating to the broad and systematic fraud scheme "was not material."  For example,

- Representative Brad Sherman: "If [your customers] want their day in court, are you going to screw them out of that?"  Stumpf: "This is not . . . we're taking this very seriously . . . I told our people . . . Sherman: "Will you let them go to court if they want to go to court? Yes or No?"  Stumpf: "No . . ."

- Representative Sherman: "This sham was not an attempt to steal a few million dollars in fees from your customers, although that's important,

---

[25] *E.g.*, "Wells Fargo CEO's testimony was not believable, expert says," James Rufus Koren, *Los Angeles Times*, Sep. 20, 2016, *available at* http://www.latimes.com/business/la-fi-wells-fargo-live-1474402107-htmlstory.html.

because you could say that a few million dollars wasn't material.  What was material was the price of your stock.  You opened two million phony accounts and then went and told … and had to be material cause you were bragging about it to the people investing in your stock -- that you had higher penetration rates, more accounts per customer, that the number of banking customers that had credit cards had grown from the mid-20% up to 42%, so it had to be material.  You were talking about it.  The peak firings, according to your own documents, was in 2013, so you knew you had a problem then."

- Representative Sherman: "Why didn't you tell shareholders our penetration rates are phony, our new accounts are phony accounts, and when we tell you we're deepening our relationship with our customers, we're doing so by putting them through the wringer.  What internal audit system did you have that assured you that you didn't have a material problem?"

- Representative Sherman: "Mr. Stumpf, you were bragging … you were firing, according to your own documents, the highest number of people in 2013, but bragging about your penetration rates, the number of accounts opening, in 2014, so you knew it was material to shareholders and you knew it was a phony number that you had fired people for falsifying."

- Representative Sherman: "You fired 5,300 people.  You took 5,300 good Americans and turned them into felons, with a system that you created, benefited from, *and drove your stock price up by bragging about your levels of new accounts*."

101.    Additionally, federal prosecutors in the U.S. Attorney's Offices for the Southern District of New York and the Northern District of California have opened investigations into Wells Fargo's sales practices.  The prosecutors have issued a subpoena to the Company for documents and materials.

### E.    WELLS FARGO'S ACTIONS CONSTITUTE A VIOLATION OF FEDERAL BANKING LAWS

102.    Wells Fargo is regulated and examined by numerous federal regulators, including the OCC, the FDIC, the Federal Reserve Board (FRB), the CFPB, the SEC and the Commodities Futures Trading Commission (CFTC).  Many of these regulators place

an affirmative duty on a bank's board of directors to establish and monitor policies and procedures related to risk controls. By allowing the Company's employees to open at least 2.1 million sham accounts over a five-year period, Wells Fargo's Board failed in its duties to establish and monitor policies and procedures related to opening customer accounts.

### 1.    The FDIC and the OCC

103.    The FDIC has enumerated the duties of bank directors as follows:

> Directors and officers of banks have obligations to discharge duties owed to their institution and to the shareholders and creditors of their institutions, and to comply with federal and state statutes, rules and regulations. Similar to the responsibilities owed by directors and officers of all business corporations, these duties include the duties of loyalty and care.

> ***The duty of loyalty requires directors and officers to administer the affairs of the bank with candor, personal honesty and integrity*** . . . . [26]

> The duty of care requires directors and officers to act as prudent and diligent business persons in conducting the affairs of the bank.

> This means that ***directors are responsible*** for selecting, monitoring, and evaluating competent management; establishing business strategies and policies; monitoring and assessing the progress of business operations; ***establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness;*** and for making business decisions on the basis of fully informed and meaningful deliberation.[27]

104.    Although the FDIC places a duty on directors to monitor the Company's adherence to statutes, regulations, and principles of safety and soundness, Wells Fargo's

---

[26] Throughout this Complaint, emphasis has been added unless otherwise indicated.

[27] FDIC Financial Institution Letter (FIL--87--92) dated December 3, 1992, *available at* https://www.fdic.gov/regulations/laws/rules/5000-3300.html.

Directors grossly abrogated these duties by permitting employees to open at least 2.1 million sham accounts over a five-year period.

105.    Similarly, the OCC describes the primary fiduciary duties of bank directors as follows:

> While holding companies of large banks are typically managed on a line of business basis, directors at the bank level are responsible for oversight of the bank's charter—the legal entity. Such responsibility requires separate and focused governance. *We have reminded the boards of banks that their primary fiduciary duty is to ensure the safety and soundness of the national bank or federal savings association. This responsibility involves focus on the risk and control infrastructure.* Directors must be certain that appropriate personnel, strategic planning, risk tolerance, operating processes, delegations of authority, controls, and reports are in place to effectively oversee the performance of the bank. The bank should not simply function as a booking entity for the holding company. *It is incumbent upon bank directors to be mindful of this primary fiduciary duty as they execute their responsibilities.*[28]

106.    According to the OCC's September 6, 2016 Consent Order, the OCC "identified (1) deficiencies and unsafe or unsound practices in the Company's risk management and oversight of the Company's sales practices, and (2) unsafe or unsound sales practices by the bank."  The OCC's official recognition of the unsafe and unsound sales practices, risk management, and oversight at the Company (paired with a $35 million penalty), leave little doubt that the Board grossly abrogated its OCC-mandated duties to oversee the Company's risk and control infrastructure and ensure the safety and soundness of the bank.

---

[28] Testimony of Thomas J. Curry, Comptroller of the Currency, before the Financial Services Committee, U.S. House of Representatives (June 19, 2012), *available at* https://occ.gov/news-issuances/congressional-testimony/2012/pub-test-2012-91-written.pdf.

### 2.    The Bank Secrecy Act, The Anti-Money Laundering Act, and the Requirement to "Know Your Customer"

107.    The Bank Secrecy Act of 1970 (or "BSA") requires financial institutions in the United States to assist U.S. government agencies to detect and prevent money laundering.  Among other things, the BSA requires financial institutions to report suspicious activity that might signify money laundering, tax evasion, or other criminal activities.  (The BSA has since been amended several times, including in title III of the USA PATRIOT Act.  The BSA is sometimes referred to as an "anti-money laundering" law ("AML"), or jointly as "BSA/AML.")

108.    The BSA requires all banks in the United States, to have an effective program in place to assure that the bank knows the identities of its customers and understands the nature of its customers' business activities.  *See generally* Bank Secrecy Act, 31 U.S.C. § 5311 et seq.; USA PATRIOT Act, § 326; 31 U.S.C. §5318; 31 C.F.R. § 1020 et seq. (formerly 31 C.F.R. § 103 et seq.).  According to the Federal Financial Institutions Examination Council's ("FFIEC"),[29] a critical component to a bank's "safety and soundness and protection from reputational risks" is its ability to implement controls related to customer identification and the monitoring of customer activities.[30]  This ability is considered part of a bank's standard due diligence and is meant to address the many

---

[29] The FFIEC is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the FRB, the FDIC, the National Credit Union Administration (NCUA), the OCC, and the CFPB, and to make recommendations to promote uniformity in the supervision of financial institutions.

[30]  *See* "Core Examination Overview and Procedures for Regulatory Requirements and related Topics – Customer Identification Program"

risks facing banks and the financial system as a whole, including the risks of fraud,

money laundering, or other improper activity.[31]

109.   The FFIEC requires that all banks have a Customer Identification Program

("CIP") that is intended to, among other things, enable the bank to know the identity of

each customer.  Moreover, the CIP must include account-opening procedures that specify

the identifying information that will be obtained from each customer and a risk

assessment of their customer base and product offerings.  The CIP must be incorporated

into the bank's BSA/AML compliance program, which is subject to approval by the

bank's board of directors.

110.   According to the FFIEC, "***The board is responsible*** for setting an

appropriate culture of BSA/AML compliance, establishing clear policies regarding the

management of key BSA/AML risks, and ensuring that these policies are adhered to in

practice."[32]

111.   To provide further guidance to banks on what BSA compliance requires,

the FFIEC published a Bank Secrecy Act/Anti-Money Laundering Examination Manual

("BSA Manual").  The BSA Manual makes clear that the responsibility for ensuring an

---

[31] Large banks like Wells Fargo "aggregate risk of all types (*e.g.*, compliance, operational, credit, interest rate, etc.) on a firm-wide basis in order to maximize efficiencies and better identify, monitor, and control all types of risks within or across affiliates, subsidiaries, lines of business, or jurisdictions."  FFIEC BSA/AML Examination Manual at 155 (Nov. 17, 2014), *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2014_v2.pdf.

[32] FFIEC's Expanded Examination Overview and Procedures for Consolidated and Other Types of BSA/AML Compliance Program Structures, *available at* https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_039.htm

effective system of internal controls rests firmly with a bank's board of directors and

senior management, stating:

> The **board of directors, acting through senior management, is ultimately responsible** for ensuring that the bank maintains an effective BSA/AML internal control structure, **including suspicious activity monitoring and reporting.** The board of directors and management should create a culture of compliance to ensure staff adherence to the bank's BSA/AML policies, procedures, and processes.[33]

112.    The BSA Manual also notes that "While the board of directors may not

require the same degree of training as banking operations personnel, they need to

understand the importance of BSA/AML regulatory requirements, the ramifications of

noncompliance, and the risks posed to the bank."[34]

113.    Here, instead of ensuring the existence of a robust compliance program

with real teeth, the Board knowingly supported an abnormally aggressive sales culture

that mandated and strictly enforced unrealistic and unattainable sales quotas.  As a direct

result, Wells Fargo employees engaged in numerous suspicious transactions that included

opening 1.5 million deposit accounts and over 500,000 credit cards, without

authorization, which activities should have been flagged by any standard BSA/AML

compliance program.   Again, the Board failed in its duty to ensure that the Company

maintained an effective BSA/AML internal control structure.

---

[33] https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_007.htm

[34] *Id.*

### 3.      The CFPB

114.    In 2010, the CFPB was established under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank").   Among other things, the CFPB was created to enforce parts of Dodd-Frank and centralize oversight of the various consumer financial protection laws, such as the Fair Debt Collection Practices Act and the Fair Credit Reporting Act.   The CFPB's stated mission is to ensure compliance with federal consumer financial laws through effective enforcement of those laws. Accordingly, Dodd-Frank authorizes the CFPB to bring enforcement actions against acts or practices in connection with consumer financial products that are unfair, deceptive, or abusive.   The CFPB's authority is broad, as it has jurisdiction over any transaction with a consumer for a consumer financial product or service.

115.    Specifically, Sections 1031(a) and 1036(a)(1)(B) of the Consumer Financial Protection Act of 2010 ("CFPA") prohibit covered persons from engaging in "deceptive" acts or practices.   12 U.S.C. §§ 5531(a), 5536(a)(1)(B).   An act or practice is deceptive under the CFPA if (1) there is a misrepresentation or omission of information that is likely to mislead consumers acting reasonably under the circumstances, and (2) that information is material to consumers.

116.    The CFPB's Consent Order, announced on September 8, 2016 (the "CFPB Consent Order") found, among other things, that WFC's "employees opened hundreds of

thousands of unauthorized deposit accounts and applied for tens of thousands of credit cards without consumers' knowledge or consent."[35]

117.    The CFPB Consent Order makes clear that it is the Company's Board that has "the ultimate responsibility for proper and sound management of [Wells Fargo] and for ensuring that [Wells Fargo] complies with Federal consumer financial law and this Consent Order."  The CFPB's findings are an acknowledgement that the Board failed in its duties.

### F.    WELLS FARGO'S SENIOR EXECUTIVES CONCEALED RAMPANT AND SYSTEMIC FRAUD AND ENRICHED THEMSELVES AT THE EXPENSE OF PLAN PARTICIPANTS

118.    Since at least 2010, Defendants were aware of systemic criminal conduct through internal and external reports and investigations, yet failed to disclose the scope and extent of the problem to the Plan Participants or the public, and failed to take any corrective action for Plan Participants.

119.    As recently reported by *The New York Times*, Wells Fargo employees tried to avail themselves of the reporting structure purportedly put in place by Wells Fargo to elevate concerns about abusive sales practices, among other things, to Wells Fargo higher ups over the years.[36]  Internal and external investigations resulted in the termination of thousands of employees since at least 2011.

---

[35] CFPB Consent Order ¶14.

[36] Many complaints came by way of the Wells Fargo ethics "hotline" managed and/or overseen by Wells Fargo's human resource department.  Thus, such complaints would have certainly been known by Defendant, Wells Fargo Director of Human Resources.

120.    Despite knowing of the rampant misconduct, and terminating thousands of employees for the creation of millions of fraudulent accounts and other unlawful activities, the Company never disclosed this information to its investors, including Plan Participants.  The Company's CEO confirmed at the Senate Hearing that Wells Fargo never disclosed the widespread fraud or related investigations because it was "not material."  Nor did Defendants take corrective measures to stop the fraud until after the public disclosure – only recently announcing that the Company would eliminate its sales quotas, change its incentive structure, and clawback compensation from responsible senior executives.

121.    At all relevant times, Wells Fargo's senior executives, including its CEO and Chairman, personally benefitted from the stock-price inflation resulting from Defendants' failure to fix the systemic problems or disclose material non-public information related to the systemic criminal conduct associated with cross-selling. Specifically, these senior executives set and tolerated the offending cross-selling policies, publicly promoted the rise in cross-selling to help drive up the share prices, and then sold millions of their own shares at inflated prices, knowing that the cross-selling program and the Company's reputation was on the verge of collapse.

122.    For example, Mr. Stumpf – Wells Fargo's CEO and Chairman – by his own admission to the Senate Committee, was aware of the systemic criminal conduct associated with cross-selling since at least 2013.  Yet in multiple quarterly earnings calls after he learned of the problem, he personally touted the rise in cross-selling as one of the primary reasons investors should buy more stock.  The resulting rise in share prices

during this timeframe earned him over $200 million.  In fact, he realized much of this enormous gain mere months before the announcement of the $185 million fine which led to the precipitous drop in Wells Fargo's stock price.

123.    Thus, rather than take corrective action to protect Plan Participants, Defendants' senior executives, including Wells Fargo's top managers, made millions of dollars by trading their own Wells Fargo shares while withholding material non-public information that was certain to (and did) significantly depress the Company's stock price once disclosed.

### G.    DAMAGES TO THE COMPANY

124.    The Company's misconduct has wrought extreme financial and reputational damage upon it.  This reputational harm undoubtedly translates into long-term damage to the Company.  This is especially harmful to Wells Fargo because banking, and particularly retail banking, is an industry built on customer trust and the integrity of the bank.  As stated by its Chairman and CEP John Stumpf, "Everything we do is built on trust. It doesn't happen with one transaction, in one day on the job or in one quarter. It's earned relationship by relationship."[37]  Wells Fargo has taken great pains to set itself apart from its competitors in order to create a reputation based on integrity and honesty, holding itself out as a bank for Main Street rather than Wall Street.  As Wells Fargo emphasizes in its own literature:

> We have a responsibility to always act with honesty and integrity. When we
> do so, we earn the trust of our customers. We have to earn that trust every

---

[37] https://www.wellsfargo.com/about/corporate/vision-and-values/index

day by behaving ethically, rewarding open, honest communication, and holding ourselves accountable for our decisions and actions.[38]

125.    The importance of Wells Fargo's integrity and reputation is acknowledged and well accepted, once again in the words of its Chairman and CEO: "Integrity is not a commodity.  It's the most rare and precious of personal commodities.  It is the core of a person's—and a company's—reputation."[39]

126.    Wells Fargo's failure to act with integrity and honor commitments to its customers, the government, the regulators, and the public at large damages the Company's reputation.  Reputational damage leads to the public's loss of confidence in a bank and negatively affects the bank's consumer sales and ultimately its revenue and profits as it is likely that both current customers and prospective customers will refrain from doing business with a bank that they cannot trust.  For example, on September 29, 2016 California's state treasurer announced that due to the actions of Wells Fargo described herein it would suspend its business relationship with Wells Fargo for one year. This is estimated to cost Wells Fargo over $700 million,[40] not to mention the inevitable ripple effects of such a public rebuke. Likewise, on October 3, 2016, Illinois's state treasurer announced that Illinois would suspend most business with Wells Fargo for one

---

[38] Wells Fargo Code of Ethics, https://www08.wellsfargomedia.com/assets/pdf/about/corporate/code-of-ethics.pdf.

[39] https://www.wellsfargo.com/about/corporate/governance/

[40] http://www.law360.com/securities/articles/845534/calif-suspends-biz-with-wells-fargo-over-accounts-scandal?nl_pk=50f3aa5e-c57b-45fb-9eba-9e3d5a8d7cbc&utm_source=newsletter&utm_medium=email&utm_campaign=securities

year, amounting to approximately $30 billion in transactions, costing Wells Fargo millions of dollars.[41]

127.    Furthermore, loss of confidence in Wells Fargo can potentially create other problems that the Company could have otherwise avoided by acting ethically and with integrity.  In particular, there is a crisis of market confidence in the corporate governance of Wells Fargo.  As was made clear during the September 2016 Senate Hearing, the marketplace believes that upper management of Wells Fargo was aware of and either explicitly or implicitly condoned the actions.  Also, to the extent there were any type of systems or controls that had the goal of eliminating such fraud, those systems were inadequate in monitoring, detecting and resolving the problems and the risk exposures.  This equates to bad corporate governance which negatively affects market confidence in the Company and has been shown to have a direct and powerful effect on the value of Wells Fargo stock.

128.    The key principles of good corporate governance are transparency, integrity, responsibility, and fairness, and until Wells Fargo can once again prove to the public that it possesses good corporate governance and integrity, its reputation will continue to be harmed and market confidence in the Company will remain low.

129.    Wells Fargo's wrongful conduct directly caused a substantial drop in Wells Fargo's stock price.  Between the close of the market on September 7, 2016, the day before Wells Fargo's fines and the partial extent of the scandal were first disclosed, and October 4, 2016, Wells Fargo's stock price declined from $49.77 per share to $43.75 per

---

[41] http://money.cnn.com/2016/10/03/investing/wells-fargo-illinois-moratorium/

50

share, representing a drop of more than 12%, and destroying over $20 billion of the Company's market capitalization.  During that same time frame, the S&P 500 index increased from 1987.05 to 2159.73, an increase of 8.7%.[42]

130.    And further still, J.P. Morgan downgraded Wells Fargo stock after news of the $185 million in civil penalties, with analyst Vivek Juneja warning that the Company has suffered a "material reputational hit" and that "mounting public scrutiny" of the unauthorized account openings "will result in additional investigations."  That is likely to "pressure expenses and revenues" at Wells Fargo, leading Juneja to conclude that there was "significant uncertainty" about how the issue will affect the bank.

131.    Similarly, on October 4, 2016, Raymond James also downgraded Wells Fargo stock, stating that it has a "cloudy outlook on Wells Fargo as the company undergoes additional investigations, lawsuits and fines in connection to the misconduct."[43]

132.    In addition, on October 4, 2016, Fitch downgraded its outlook on Wells Fargo from stable to negative and warned that Wells Fargo may lose its AA credit rating for the first time in two decades because of potential damage to its reputation and profits from the scandal.[44]

### H.    DEFENDANTS KNEW (OR SHOULD HAVE KNOWN) THAT WELLS FARGO STOCK WAS AN IMPRUDENT INVESTMENT

---

[42] These figures are also based on the closing prices on October 4, 2016.

[43] *See* https://www.thestreet.com/story/13840685/1/wells-fargo-wfc-stock-slips-raymond-james-downgrades.html.

[44] *See* https://www.ft.com/content/1ea3633c-8a77-11e6-8aa5-f79f5696c731.

**FOR THE PLAN, YET FAILED TO PROTECT THE PLAN AND PARTICIPANTS**

133.    Because of their high-ranking positions within the Company and/or their status as the Plan's fiduciaries, Defendants knew or should have known of the existence of the abovementioned problems.  Furthermore, Wells Fargo's broad and systemic fraud scheme was perpetrated *by Wells Fargo itself*.

134.    In particular, Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, the Company stock price would suffer and devastate Participants' retirement savings as the truth became known and the information regarding the broad and systemic fraud scheme eventually was disclosed.  Yet, Defendants failed to protect the Plan and their Participants from entirely foreseeable losses.

135.    And most importantly, no prudent fiduciary could have concluded that continuing to cover up the scandal – amidst government investigations and knowing that the truth would someday be revealed – was a proper (or legal) course of conduct.  Indeed, as the Motley Fool stated on September 27, 2016 concerning the Wells Fargo scandal, "sometimes the cover-up is worse than the crime."[45]

136.    Even Mr. Stumpf has concluded that the cover-up was a mistake, telling the House Financial Services Committee that: "We should have done more sooner."

---

[45] http://www.fool.com/investing/2016/09/27/wells-fargo-ceo-john-stumpf-has-confirmed-the-the-ster.aspx.

137.    As a result of the enormous erosion of the value of Wells Fargo's stock, the Plan's Participants, the retirement savings of whom were heavily invested in Wells Fargo stock, suffered unnecessary and unacceptable losses.

138.    Defendants failed to conduct an appropriate investigation into whether Wells Fargo stock was a prudent investment for the Plan.  An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Wells Fargo stock was clearly imprudent, as well as disloyal. A prudent and loyal fiduciary acting under similar circumstances would have determined that Wells Fargo stock was not a prudent and loyal investment and acted to protect Participants against unnecessary losses, and would have made different investment decisions.

139.    Because Defendants knew, or should have known, that Wells Fargo stock was not a prudent and loyal investment option for the Plan, they had an obligation to protect the Plan and Plan Participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Wells Fargo stock.

140.    Accordingly, any Plan Participants who purchased Wells Fargo stock[46] during the Class Period did so at artificially inflated values.  Additionally, any Plan Participant who purchased or held Wells Fargo stock[47] during the Class Period suffered investment losses, and also lost out on gains experienced in alternative investments under the Plan.

---

[46] Via the 401(k) funds.

[47] Via one of the 401(k) funds.

141.   As fiduciaries, Defendants were obligated to consider whether the non-public information to which they were privy regarding the breadth and systemic extent of the fraud scheme would be material to investors, and specifically Plan Participants.  At the very least, Defendants should have *evaluated* the non-disclosed information in light of the total mix of information criteria, and if they did they would have undoubtedly determined that the information would be material to the market, shareholders, and Participants.  There is more than a substantial likelihood that a reasonable investor would have viewed this broad and systemic fraud scheme, as well as the lengthy cover-up, as having significantly altered the total mix of information available.[48]  In fact, the market reaction to the disclosure definitively proves this point.

142.   A materiality analysis requires both a quantitative analysis and a qualitative analysis which turns on what a reasonable investor would find important in making an investment decision, including the potential impact of corporate activities upon the company's reputation and share value.  Here, Wells Fargo omitted and failed to disclose material information, and engaged in a sustained cover-up, continuing to this day, despite being mandated to do so under federal securities laws and ERISA.

---

[48] While this broad and systemic fraud scheme was ongoing, Wells Fargo officials made material omissions in violation of federal securities laws while concealing the material information known by Wells Fargo about its fraud. Wells Fargo cannot conceal its own fraud.  Accordingly, both securities laws and fiduciary obligations of ERISA simultaneously demanded that Wells Fargo disclose the broad and systemic fraud scheme that was unquestionably—and has been shown to be—material information. And Wells Fargo should have disclosed its findings to the investors and Plan Participants well before it was ultimately disclosed by the Los Angeles City Attorney and two federal agencies on September 8, 2016—*the market did not even hear the information from Wells Fargo itself.*  Indeed, at this time Wells Fargo had yet to disclose its knowledge of the broad and systemic fraud in its Retail Services division and Banking division.

143.    The omitted information about the broad and systemic fraud scheme was material because, among other reasons: (a) such an omission could mask changes in earnings or sales trends; (b) the omission concerns the Banking and Retail Services divisions, each of which play a significant role in operations and profitability; (3) the omission related directly to Wells Fargo's reputation, specifically its position of trust with its own customers; and (4) the omissions involve the concealment of unlawful transactions.  Accordingly, the undisclosed fraud not only inflated Wells Fargo stock but also violated securities laws.  In addition, the lengthy cover-up made the situation even worse, as noted in the press.[49]

144.    Defendants should have prudently and loyally considered whether in light of the material non-disclosed information the stock was trading at an artificially inflated price. Such consideration could be based on whether the Company stock price is artificially inflated due to the non-disclosure of material information or such consideration could be based on whether it is reasonably foreseeable that the value of Company stock will inevitably suffer when the non-public material information is eventually disclosed.  Such delayed disclosure can typically have severe results for the value of a stock – and, indeed, it did.

145.    With regard to a delayed disclosure, Defendants knew (or should have known) that due to the Company's illegal and fraudulent acts Wells Fargo's stock price would suffer and negatively affect Participants' retirement savings as the truth was

---

[49] http://www.fool.com/investing/2016/09/27/wells-fargo-ceo-john-stumpf-has-confirmed-the-the-ster.aspx.

disclosed.  Based on Defendants' extensive business and fiduciary experience, they clearly should have expected the extremely negative market reaction that the Company stock and reputation experienced.

146.   The reasonable and easily foreseeable results of Wells Fargo's non-disclosure of the broad and systemic fraud scheme were material, including: (a) large regulatory fines; (b) shareholder lawsuits; (c) consumer lawsuits; (d) civil fines; (e) loss of stock value; (f) the adverse effect on Wells Fargo's reputation; (g) Wells Fargo's employees' losses resulting from the Plan's continued investment in Wells Fargo stock; (h) Wells Fargo included fraudulently obtained revenue as a component of its reported revenue for multiple years; (i) Wells Fargo included fraudulently obtained profits as a component of its reported profits for multiple years; (j) Wells Fargo's fraudulent acts and omissions concern the Banking and Retail services divisions of Wells Fargo's business which plays a significant role in the operations and profitability of Wells Fargo; and (k) Wells Fargo's non-disclosure as well as their misstatements and omissions involve the concealment of vastly numerous unlawful transactions.

147.   Any tension between securities law and a Defendants' fiduciary obligations is one of its own making.  Fiduciaries without disclosure obligations under the federal securities laws, as well as those with such obligations, have it within their power to prevent harmful investments by Plan Participants.  Fiduciaries without disclosure obligations should act to protect Plan Participants as soon as they know or should know that material information for which disclosure is required under securities laws is not being released to the public.  Fiduciaries without securities law disclosure obligations

should act to protect the Plan Participants under ERISA as soon as the federal securities laws require disclosure.  The fact that certain fiduciary Defendants decided not to act at an early stage does not mean that ERISA fiduciary duties do not apply thereafter.  Rather, it means quite the opposite.  It means that they are continuing to violate their fiduciary duties by not acting.

## I.     ALTERNATIVE OPTIONS

148.    Defendants had available to them several different alternative options for satisfying their duty of prudence,  including, among other things: temporarily removing the funds[50] primarily invested in Wells Fargo stock as an investment option in the Plan; discontinuing or freezing further contributions to and/or investment in Wells Fargo stock under the Plan;[51] consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; initiating investigations and corrective actions to eliminate the conflicts of interest, eliminating the Company's widespread fraudulent activities and concealment, and changing the policies and incentive structures underlying such activities; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Wells Fargo they could not loyally serve the Plan and its Participants in connection with the Plan's acquisition and holding of Wells Fargo stock.

---

[50] Including but not limited to ESOP Fund and Non-ESOP Fund.

[51] Even if Defendants feared that freezing purchases would negatively impact the Wells Fargo stock price, common sense would have told them that any such impact would be far outweighed by the damage a postponed correction and revelation of Wells Fargo's fraud would effect.  It is understood that with regard to fraud, telling the truth will cause damage, but that damage is inevitably increased the longer one engages in the conduct and refrains from telling the truth.

149.    Despite the availability of these and other options; despite Defendants having the legal authority to act; and despite Defendants having the legal duty to act; Defendants failed to take reasonable, prudent, and loyal action to protect Plan Participants from losses resulting from the Plan's investment in Wells Fargo stock.  In fact, Defendants continued to offer and to allow investment of the Plan's assets in Company stock even as Wells Fargo continued to cover up the scandal and continued to perpetrate the systemic fraud scheme.

150.    ERISA requires fiduciaries to do more than simply serve as "coach class trustees."  They have a duty to manage their employee's investments prudently, including investments in Company stock plans.  Defendants utterly failed in this duty and Wells Fargo employees and shareholders suffered the consequences.

151.    Any reasonably prudent fiduciary would have foreseen the inevitable negative impact on Company stock value that would occur upon delayed corrective actions and delayed disclosure of the broad and systemic fraud scheme, and it would have acted prudently by taking alternative actions described above in order to adhere to their ERSIA fiduciary duties.[52]

---

[52] It is not only plausible, but it is clear, that Wells Fargo could have removed the ESOP and Non-ESOP Funds from the list of investment options for the Plan or taken other alternative options as detailed in this complaint without causing undue harm to Participants because any reduction in the stock price would anticipate the inevitable result of Wells Fargo's eventual compliance with federal securities laws.  Such prudent disclosure should have occurred at the point at which Defendant fiduciaries knew (or should have known) that material information was being withheld from the public and should have prevented Participants from making continued investments in the Company stock at artificially inflated prices.

152.   As a result of Defendants' failure to take any alternative actions and the resulting and foreseeable erosion of the value of Wells Fargo's stock, the Plan Participants, whose retirement savings were heavily invested in Wells Fargo stock, suffered significant losses.

**J.    A PRUDENT FIDUCIARY COULD NOT HAVE CONCLUDED THE ALTERNATIVE ACTIONS WOULD DO MORE HARM THAN GOOD**

153.   First, where a known, ongoing fraud exists – and, therefore, a disclosure (or possibly a corrective disclosure) is separately required by securities laws – the fiduciaries' overarching objective must be to stop the fraud and prevent the Plan from continuing to purchase artificially inflated stock while the fraud continues.

154.   As detailed above, given that Wells Fargo had an obligation under the securities laws to disclose the material information relating to the fraud, a prudent and loyal fiduciary could not have concluded that taking alternative corrective actions would have caused more harm than good to Plan assets.  Delaying corrective actions and the inevitable disclosure of material information relating to the fraud ultimately will do more harm to the Company stock price than good.  Indeed, earlier corrective actions and earlier disclosure of the fraud at Wells Fargo would have caused far less harm to the Plan and Plan Participants than continuing to perpetrate and conceal the fraud.

155.   The delay in taking appropriate corrective measures, the delay in disclosing, and the nature of the eventual disclosure, have been devastating.  The cover-up has severely damaged the company's market capitalization and reputation, severely

impacted its business relationships with States and consumers, and triggered downgrades by J.P. Morgan, Raymond James, and Fitch.

156.    Second, given that the ongoing fraud was going to inevitably be unearthed (and it was), taking one of the alternative actions detailed above would not have done more harm to the Plan than good.  Rather, taking such alternative actions would have protected the Plan and avoided the large Plan losses that resulted from the continuation of the broad and systemic fraud scheme and the delayed disclosure of the non-public material information regarding the scheme.

157.    Under the circumstances alleged herein, in order to prevent greater harm caused by delayed corrective actions and disclosure, Plan fiduciaries must make inquiries and take prudent alternative actions to avoid continued fraud and continued investment in artificially inflated Company stock that will inevitably be reduced.

158.    Had Defendants fulfilled their fiduciary duties of prudence and loyalty under ERISA and chosen to implement one or more of the alternative options noted above, they would have protected the Plan from unreasonable and predictable losses exacerbated by years of additional fraud and concealment.  Such actions would certainly do more good than harm to the Plan and Plan Participants.

## VIII.  CLASS ACTION ALLEGATIONS

159.    Plaintiff brings this action individually and on behalf of all others similarly situated as a class action pursuant to the provisions of Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

160.    The Class is defined as follows:

All persons who were Participants of the Wells Fargo & Company 401(k) Plan at any time between January 1, 2014 through the present (the "Class Period") and whose Plan accounts suffered losses, as defined by ERISA, through investments in Wells Fargo common stock (the "Class").

161.    Excluded from the Class are Defendants, governmental entities, and the judge to whom this case is assigned and his/her immediate family.  Plaintiff reserves the right to revise the Class definition based on information learned through discovery.

162.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

163.    **Numerosity - Federal Rule of Civil Procedure 23(a)(1).**  The members of the Class are so numerous that individual joinder of all the members is impracticable.  On information and belief, there were not less than 350,000 Plan Participants during the time period relevant to this action.  The precise number of Class members and their addresses is presently unknown to Plaintiff, but may be ascertained from Wells Fargo's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

164.    **Commonality and Predominance - Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**  Numerous common questions of law and fact exist as to Plaintiff and the other Class members.  Such questions Class include, but are not limited to:

- Whether Defendants caused the Plan to invest its assets in funds and other investment products offered or managed by Wells Fargo subsidiaries and affiliates;

- Whether Defendants caused the Plan to imprudently invest its assets in funds invested in Wells Fargo stock;

- Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

- Whether Wells Fargo breached its duty to monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA;

- Whether Defendants are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

- Whether the Plan and its Participants suffered losses as a result of Defendants' fiduciary breaches;

- Whether Defendants are liable under 29 U.S.C. § 1132(a)(3) to disgorge the revenues they earned as a result of the fiduciary breaches that occurred;

- The proper form of equitable and injunctive relief; and

- The proper measure of monetary relief.

Defendants have engaged in a common course of conduct toward Plaintiff and the other Class members. The common issues arising from this conduct that affect Plaintiff and the other Class members predominate over any individual issues. Adjudication of

these common issues in a single action has important and desirable advantages of judicial economy.

165. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because, among other things, all members of the Class were comparably injured through the uniform misconduct described above.

166. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Class members she seeks to represent; Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation, including ERISA litigation; and Plaintiff intends to vigorously prosecute this action. Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

167. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, thus rendering it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By

contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  This is particularly true here, where Defendants, as Plan fiduciaries, were obligated to treat all Class members similarly as Plan Participants under written Plan documents and ERISA, which impose uniform standards of conduct on fiduciaries.

168.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

169.    **Risk of Inconsistent/Dispositive Adjudications – Federal Rule of Civil Procedure 23(b)(1).**  Class certification under Rule 23(b)(1) is merited here because prosecution of separate actions by individual Class members would create the risk of (a) inconsistent of varying adjudications with respect to individual Class members that would establish incompatible standards of conduct Defendants; or (b) adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

## IX.    CLAIMS FOR RELIEF UNDER ERISA

170.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

171.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA§ 409, 29 U.S.C. § 1109.

172.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides, in pertinent part, that a participant may seek appropriate equitable relief for a violation of Title I of ERISA.

173.   Plaintiff, therefore, brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the Defendants' breaches of their fiduciary duties for violations under ERISA § 404(a)(l) and ERISA § 405(a), and ERISA § 502(a)(3) for appropriate equitable relief to remedy violations of Title I of ERISA.

## COUNT I
### Breach of Fiduciary Duty in Managing and Administering Plan
### (Violations of ERISA § 404)

174.   Plaintiff incorporates all factual allegations in the preceding paragraphs as if fully set forth herein.

175.   At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

176.   Under ERISA, fiduciaries who exercise discretionary authority or control over management of a Plan or disposition of a Plan's assets are responsible for ensuring that investment options made available to Participants under a Plan are prudent and not artificially inflated in value.

177.   Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and not artificially inflated in value, and that such investments are consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of Wells Fargo's stock being artificially inflated in price during the Class Period, and thus not prudent and not consistent with the purposes of the Plan.

178.   A fiduciary's duty of loyalty and prudence requires it to disregard Plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm Plan Participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus a fiduciary may not blindly follow Plan documents or directives that would lead to an imprudent result or that would harm Plan Participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the Plan, including Plan trustees, to do so.

179.   A fiduciary's duty of loyalty and prudence also obligates them to avoid conflicts of interest, to speak truthfully to Participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan Participants need in order to exercise their rights and interests under the Plan.  This duty to inform Participants includes an obligation to provide Participants of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan Participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

180.   Defendants breached their duties of loyalty and prudence.  During the Class Period, Defendants engaged in an illegal scheme to hide or conceal material adverse facts about the broad and systemic fraud scheme.  Defendants knew that Wells stock had become artificially inflated in value and that Plan Participants lacked sufficient and material information to evaluate its prudence and appropriateness as an investment option for Plan Participants' retirement savings.  Accordingly, Defendants should have taken appropriate alternative actions, as detailed above, but failed to do so.

181.   Defendants had actual knowledge that Plan Participants did not have full and complete information about the Company, and thus were unable to make fully informed decisions about whether to purchase Company stock, hold Company stock, or invest in alternatives under the Plan.

182.   As a direct and proximate result of Defendants' fiduciary duty breaches alleged herein, the Plan, and Plaintiff, and the other Plan Participants, suffered damage to and/or lost a significant portion of their retirement investments in an amount to be determined at trial.  Had Defendants taken the appropriate steps to comply with their fiduciary obligations, Plan Participants would have avoided foreseeable losses from transactions in Wells Fargo stock and thereby eliminated, or at least reduced, losses to the Plan.

## COUNT II
### Co-Fiduciary Liability

183.   Plaintiff incorporates all factual allegations in the preceding paragraphs as if fully set forth herein.

184.    This count alleges co-fiduciary liability against all Defendants (the "Co-fiduciary Defendants").

185.    As alleged above, during the Class Period, the Co-Fiduciary Defendants were fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Defendants were thus bound by the duties of loyalty, exclusive purpose, and prudence.

186.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same Plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-fiduciary Defendants breached all three of these provisions.

187.    <u>Knowledge of a Breach and Failure to Remedy</u>:  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, each Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

188.    <u>Knowing Participation in a Breach</u>:  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same Plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Various fiduciary Defendants knowingly participated in

the breaches of other fiduciary Defendants because, as alleged above, they had actual knowledge of the facts that rendered the Company stock an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted certain Defendants to breach their duties.  Moreover, as alleged above, each of the Defendants participated in the management and/or administration of the Plan's improper investment in the artificially inflated Company stock and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

189.    <u>Enabling a Breach</u>:  ERISA § 405(a)(2), 29 U.S.C. §1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

190.    As a direct and proximate result of Defendants' fiduciary duty breaches alleged herein, the Plan, and Plaintiff, and the other Plan Participants, were damaged and sustained losses in an amount to be determined at trial.

191.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Co-fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### <u>COUNT III</u>
### Failure to Monitor Fiduciaries

192.    Plaintiff incorporates all factual allegations in the preceding paragraphs as if fully set forth herein.

193.    As alleged throughout the Complaint, Wells Fargo is a Plan fiduciary.

194.    On information  and belief, through its selection, management, and supervision of the Employee Benefits Review Committee ("EBRC," defined above), Wells Fargo exercises discretionary authority or discretionary control respecting management of the Plan, as well as discretionary authority and responsibility with respect to the administration of the Plan, and is, therefore, a fiduciary under 29 U.S.C. § 1002(21)(A).

195.    Wells Fargo had overall oversight responsibility for the Plan, and the explicit responsibility for appointing and removing EBRC members.  Wells Fargo had a fiduciary responsibility to monitor the performance of the other Plan fiduciaries, including the EBRC.

196.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of Plan assets, and must take prompt and effective action to protect the Plan and its Participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

197.    To the extent that Wells Fargo's fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

198.    Wells Fargo breached its fiduciary monitoring duties by, among other things,

(a)    Failing to monitor and evaluate the performance of the other fiduciary Defendants or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of the other fiduciary Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated, which would have altered a prudent fiduciary to take alternative actions; and

(c)    failing to remove fiduciaries whose performance was inadequate in that they continued to imprudently allow Plan investment in artificially inflated Wells Fargo stock.

199.    As a consequence of the foregoing breaches of the duty to monitor, the Plan, and Plaintiff, and the other Plan Participants, were damaged and sustained losses in an amount to be determined at trial.  Had Wells Fargo not abrogated its duty to monitor, Plan Participants would have avoided foreseeable damages and losses.

200.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Wells Fargo is liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from their failure to properly monitor the Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

## **COUNT IV**
### **Other Equitable Relief Based on Ill-Gotten Proceeds 29 U.S.C. § 1132(a)(3)**

201.    Plaintiff incorporates all factual allegations in the preceding paragraphs as if fully set forth herein.

202.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA.  A defendant may be held liable under that section regardless of whether it is a fiduciary. A non-fiduciary transferee of ill-gotten proceeds is subject to equitable disgorgement of those assets if the

non-fiduciary had actual or constructive knowledge of the circumstances that rendered the transaction or payment a violation of ERISA.

203.    Defendants profited from the Plan's investments in Wells Fargo stock.

204.    Pursuant to 29 U.S.C. § 1132(a)(3), Defendants should be required to disgorge all monies they received during Class Period as a result of the Plan's investments in Wells Fargo stock.  Investment in Wells Fargo common stock violated ERISA based on the facts set alleged herein.  Moreover, Wells Fargo had actual or constructive knowledge of circumstances rendering the selection and retention of Wells Fargo common stock unlawful, by virtue of, among other things:

> (a)    the Committee members with executive positions at multiple Wells Fargo affiliates;
>
> (b)    other dual-hatted employees;
>
> (c)    Defendants' affiliation with Wells Fargo;
>
> (d)    Wells Fargo's participation in the Plan as employers with employees in the Plan; and
>
> (e)    Wells Fargo's general operational interconnectedness.

205.    Based on the foregoing allegations, and other facts likely to be revealed through discovery, Defendants had actual or constructive knowledge of the process for selecting and monitoring Plan investments in the Plan, and knew that this process was designed to enrich the Company at the expense of Plan Participants.  Based on this and other facts within their knowledge, Defendants were breaching their fiduciary duties by failing to take prudent actions to protect the Plan and Plan Participants.

206.    Given their knowledge of these fiduciary breaches, Wells Fargo had actual or constructive knowledge that the monies they were receiving from or in connection with Plan assets were being received as a result of Defendants' fiduciary breaches.

207.    Therefore, to the extent any ill-gotten revenues and profits are not disgorged under the relief provisions of 29 U.S.C. § 1109(a), the Court should order appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to disgorge these monies from Wells Fargo under principles of unjust enrichment and equitable restitution.

## X.    CAUSATION

208.    The Plan suffered not less than hundreds of millions of dollars in damages and losses because Defendants breached their fiduciary duties by allowing substantial Plan assets to be invested in Wells Fargo stock during the Class Period.

209.    Had Defendants properly discharged their fiduciary and co-fiduciary duties by, among other options, eliminating Wells Fargo stock as an investment alternative, providing earlier and truthful disclosure, freezing the offering of Wells Fargo common stock to Plan Participants, or divesting the Plan of Wells Fargo stock, the Plan, and Plaintiff, and the other Plan Participants would have avoided the damages and losses that they sustained.

## XI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court grant the following relief:

(a)     Determining that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

(b)     Designating Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

(c)     Declaring that Defendants have breached their fiduciary duties under ERISA;

(d)     Compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

(e)     Requiring Defendants to disgorge all revenues received from the Plan, and/or equitable relief pursuant to 29 U.S.C. 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

(f)     Enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(g)     Granting other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointing an independent fiduciary or fiduciaries to run the Plan; transferring Plan assets our of imprudent investments into prudent alternatives; and removing Plan fiduciaries deemed to have breached their fiduciary duties;

(h)     Awarding pre-judgment interest;

(i)     Awarding attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or

the common fund doctrine; and

(j)     Awarding such other relief as the Court deems equitable and just.

Dated:  October 7, 2016            **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

By:  s/  Robert K. Shelquist
     Robert K. Shelquist, #21310X
     Rebecca A. Peterson, #392663
100 South Washington Avenue, Suite 2200
Minneapolis, Minnesota  55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

Adam J. Levitt (*pro hac vice* motion to be filed)
Daniel R. Ferri (*pro hac vice* motion to be filed)
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
Telephone:  (312) 214-0000
Facsimile:  (312) 214-0001
alevitt@gelaw.com
dferri@gelaw.com

Charles T. Caliendo (*pro hac vice* motion to be filed)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, New York  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501
alevitt@gelaw.com
dferri@gelaw.com

Richard M. Elias (*pro hac vice* motion to be filed)
Greg G. Gutzler (*pro hac vice* motion to be filed)
Tamara M. Spicer (*pro hac vice* motion to be filed)
**ELIAS GUTZLER SPICER LLC**
1924 Chouteau Avenue, Suite W
St. Louis, Missouri  63103
Telephone:  (314) 833-6645
Facsimile:  (314) 621-7607
relias@egslitigation.com
ggutzler@egslitigation.com
tspicer@egslitigation.com

W. Daniel "Dee" Miles, III (*pro hac vice* motion to be filed)
Rebecca D. Gilliland (*pro hac vice* motion to be filed)
Claire E. Burns (*pro hac vice* motion to be filed)
**BEASLEY ALLEN CROW METHVIN
  PORTIS & MILES, P.C.**
218 Commerce Street
Montgomery, Alabama  36103
Telephone:  (334) 269-2343
Facsimile:  (334) 954-7555
Dee.Miles@beasleyallen.com
Rebecca.Gilliland@beasleyallen.com
Claire.Burns@beasleyallen.com

***Counsel for Plaintiff and the Proposed Class***