UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: WELLS FARGO ERISA 401(k) LITIGATION | Case No. 16-CV-3405 (PJS/BRT) |
| | ORDER |

Adam J. Levitt, Daniel R. Ferri, and Amy E. Keller, DICELLO LEVITT & CASEY LLC; Robert K. Shelquist and Rebecca A. Peterson, LOCKRIDGE GRINDAL NAUEN P.L.L.P.; Richard M. Elias, Greg G. Gutzler, and Tamara M. Spicer, ELIAS GUTZLER SPICER LLC; Lori G. Feldman and Michael B. Ershowsky, LEVI & KORSINSKY LLP; W. Daniel "Dee" Miles, III, Rebecca D. Gilliland, and Claire E. Burns, BEASLEY ALLEN CROW METHVIN PORTIS & MILES, P.C.; Samuel E. Bonderoff, Jacob H. Zamansky, Edward H. Glenn Jr., and Justin Sauerwald, ZAMANSKY LLC; Carolyn G. Anderson and June P. Hoidal, ZIMMERMAN REED LLP; and Douglas J. Nill, DOUGLAS J. NILL, PLLC, for plaintiffs.

Russell L. Hirschhorn, Joseph E. Clark, Howard Shapiro, and Lindsey H. Chopin, PROSKAUER ROSE LLP; and Kirsten E. Schubert and Stephen P. Lucke, DORSEY & WHITNEY LLP, for defendants.

This lawsuit—brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.—is one of many actions in which "plaintiffs' attorneys have taken what is essentially a securities-fraud action and pleaded it as an ERISA action in order to avoid the demanding pleading requirements of the Private Securities Litigation Reform Act of 1995 ('PSLRA'), Pub. L. 104–67, 109 Stat. 737." *Wright v. Medtronic, Inc.*, No. 09-CV-0443 (PJS/AJB), 2010 WL 1027808, at *1 (D. Minn. Mar. 17, 2010). "Plaintiffs' attorneys are able to evade the PSLRA in this manner—as well as take advantage of the strict duties imposed on fiduciaries by ERISA—by suing not on behalf of those who purchased the stock of a company as members of the

investing public, but instead on behalf of those who purchased the stock of a company as participants in a defined-contribution plan sponsored by that company." *Id.*

In this lawsuit, the company at issue is defendant Wells Fargo & Company ("Wells Fargo"), and the plaintiffs at issue are current and former employees of Wells Fargo who held the company's stock in their 401(k) accounts. The price of Wells Fargo stock dropped sharply—and plaintiffs consequently suffered significant losses—after Wells Fargo and the United States government announced in September 2016 that thousands of Wells Fargo employees had engaged in unethical sales practices, including opening deposit accounts and issuing credit cards without the knowledge or consent of customers.

Plaintiffs allege that the fiduciaries of Wells Fargo's 401(k) plan were corporate insiders who knew about the improper sales practices long before the public announcement. Plaintiffs now sue those fiduciaries, arguing that they violated their duty of prudence under ERISA by not disclosing the improper sales practices prior to September 2016. According to plaintiffs, if the fiduciaries had disclosed that inside information earlier, the value of the Wells Fargo stock in plaintiffs' 401(k) accounts would not have dropped as much as it did following the September 2016 announcement.

The Supreme Court considered a similar claim in *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S. Ct. 2459 (2014). In *Dudenhoeffer*, the defendants argued that "the threat of costly duty-of-prudence lawsuits will deter companies from offering ESOPs to their employees." *Id.* at 2470. ("ESOPs" is an abbreviation for "employee stock ownership plans.") In response, the Supreme Court emphasized that Fed. R. Civ. P. 12(b)(6)—as interpreted in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)—provides an "important mechanism for weeding out meritless claims." *Dudenhoeffer*, 134 S. Ct. at 2471. The Supreme Court then instructed district courts handling lawsuits challenging the failure of ERISA fiduciaries to disclose inside information to determine "whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that . . . publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Id.* at 2473.

This is a very tough standard. Trying to predict the impact of *anything* on the price of a company's stock—like trying to predict the impact of an athlete's injury on an upcoming game or the impact of a politician's gaffe on an upcoming election—is a highly speculative endeavor. An ERISA fiduciary who is trying to figure out whether earlier disclosure of negative inside information would have more or less of an impact

on a stock's price than later disclosure of that negative information is trying to predict the future on the basis of information that is incomplete, imperfect, and fluid. In light of the inherently uncertain nature of this task, plaintiffs will only rarely be able to plausibly allege that a prudent fiduciary "*could not*" have concluded that a later disclosure of negative inside information would have less of an impact on the stock's price than an earlier disclosure. *Id.* (emphasis added).

This is not that rare case. Plaintiffs have not plausibly alleged that defendants could not have concluded that an earlier disclosure of the unethical sales practices would have done more harm than good. The Court therefore dismisses plaintiffs' amended complaint.

I. BACKGROUND

Wells Fargo sponsors a 401(k) plan ("the Plan") for its employees. ECF No. 54 ¶ 55. Eligible employees may contribute their own money to their individual 401(k) accounts. *Id.* ¶ 58. If they do, Wells Fargo matches their contributions, dollar-for-dollar, up to a certain amount. *Id.* ¶ 61; ECF No. 116-1 § 5.1(a).

Two of the Plan's investment funds—the Wells Fargo Non-ESOP Fund and the Wells Fargo ESOP Fund—"consist primarily of shares of Company Stock." ECF No. 116-1 § 8.1(a)-(b). Wells Fargo's matching contributions are also "invested automatically in Wells Fargo stock." ECF No. 54 ¶ 62. At any given time, then, a large

portion of the Plan's assets is invested in Wells Fargo stock. *See id.* ¶ 60 (estimating that "approximately 34% of the 401(k) Plan Assets . . . were invested in Wells Fargo common stock" in 2016). Wells Fargo employees are not required to keep their 401(k) money invested in Wells Fargo stock. They may transfer their money into "any other Investment Fund" maintained by the Plan, including funds that do not invest in Wells Fargo stock. ECF No. 116-1 § 8.6(a).

The amended complaint alleges that Wells Fargo has been engaging in widespread unethical sales practices since at least 2005. *See* ECF No. 54 ¶¶ 88-103, 112, 163. For example, Wells Fargo opened more than 1.5 million deposit accounts for customers without their authorization. *Id.* ¶¶ 92, 102. Wells Fargo also submitted over 500,000 credit-card applications for customers without their permission. *Id.* ¶¶ 93, 102. Because of these improper sales practices, "federal banking regulators announced [in September 2016] that Wells Fargo had been fined $185 million." *Id.* ¶ 169. That was the first public disclosure of the unethical sales practices, and the market value of Wells Fargo's stock fell in response to the disclosure. *Id.* ¶¶ 175, 186, 199.

Plaintiffs allege that the Plan's fiduciaries—who were also corporate insiders— "were aware of systemic criminal and unethical conduct at the Company since as early as 2005," yet they failed to disclose this fraud to the public. *Id.* ¶ 163. Plaintiffs claim that earlier disclosure would have mitigated the impact on Wells Fargo's stock price

that would inevitably result from the disclosure of Wells Fargo's fraud. *See id.* ¶ 208 ("Defendants . . . knew that . . . the longer the fraud is permitted to fester, and the longer the fraud is concealed, the greater the inflation and the greater the ultimate damage upon revelation—which is *precisely* what happened here."); *id.* ¶ 220 ("[T]he lengthy cover-up made the situation far worse for Plan Participants."). Plaintiffs also allege that the Plan's fiduciaries acted imprudently by failing to take other corrective measures to protect participants, such as "implementing processes to stop the known fraud"; temporarily freezing stock purchases and sales to prevent Plan participants from purchasing more Wells Fargo stock at inflated prices; "[d]iscontinuing the automatic investment" of matching contributions in Wells Fargo stock; or purchasing a hedging product. *Id.* ¶ 229.

## II. ANALYSIS

Plaintiffs allege that defendants violated their duties of prudence and loyalty under ERISA. *See* 29 U.S.C. § 1104(a)(1)(A)-(B). The Court will address each of these duties in turn.

### A. Duty of Prudence

ERISA requires plan fiduciaries to manage their plans prudently. 29 U.S.C. § 1104(a)(1)(B). ERISA generally allows fiduciaries to invest plan assets "in the stock of the company that employs the plan participants." *Dudenhoeffer*, 134 S. Ct. at 2463,

2465-66; *see also* 29 U.S.C. § 1104(a)(2) (exempting employee stock ownership plans from ERISA's diversification requirement). But in some situations, it may be imprudent for a fiduciary to allow plan participants to invest in overpriced stock.

As a general matter, plan fiduciaries may "prudently rely on the market price" of a publicly-traded stock as "the best estimate of" its value. *Dudenhoeffer*, 134 S. Ct. at 2471 (citation omitted). In other words, the duty of prudence does not require plan fiduciaries to "outsmart a presumptively efficient market." *Id.* at 2472 (citation omitted). Therefore, "allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances." *Id.* at 2471.

One such "special circumstance" occurs when a fiduciary has inside information that a publicly-traded stock is overpriced. *See id.* at 2472. In this situation, a fiduciary cannot rely on the stock's market price, because the fiduciary knows that the market price is inflated. But fiduciaries nevertheless face "unique challenges" when they are accused of imprudently "fail[ing] to act on inside information they had about the value of the employer's stock." *Amgen Inc. v. Harris*, 136 S. Ct. 758, 759 (2016) (latter quote from *Dudenhoeffer*, 134 S. Ct. at 2469). One obvious challenge is that it is illegal for anyone, including the fiduciary of an ERISA plan, to trade on the basis of inside

information. ERISA's duty of prudence does not "require an ESOP fiduciary to perform an action—such as divesting the fund's holdings of the employer's stock on the basis of inside information—that would violate the securities laws." *Dudenhoeffer*, 134 S. Ct. at 2472.

Given the difficult situation facing an ERISA fiduciary, the Supreme Court in *Dudenhoeffer* established a demanding pleading standard for "a claim for breach of the duty of prudence on the basis of inside information." *Id*. To withstand a motion to dismiss such a claim, "a plaintiff must plausibly allege [1] an alternative action that the defendant could have taken [2] that would have been consistent with the securities laws and [3] that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id*. Here, plaintiffs' amended complaint meets only two of these three requirements.

1. An Alternative Action

The amended complaint identifies five alternative actions that the Plan's fiduciaries could have taken to protect the Plan's assets. According to the amended complaint, the Plan's fiduciaries could have (1) implemented processes to stop the fraud; (2) disclosed the fraud to Plan participants, the government, and the public; (3) frozen "further stock purchases (and sales)" to "prevent[] Plan Participants from purchasing billions of dollars of Wells Fargo stock at fraudulently-inflated values";

(4) stopped matching employer contributions in Wells Fargo stock; and (5) purchased a "hedging product" to offset the anticipated losses that the Plan would incur when Wells Fargo's unethical sales practices came to light. ECF No. 54 ¶ 229.

The implementation of any of these alternatives would have required disclosure, however. Obviously, the disclosure alternative would have required disclosure, but the fiduciaries could not have implemented any of the other alternatives without also disclosing the unethical sales practices. Thus, if the fiduciaries did not violate their duty of prudence when they failed to disclose, they also did not violate their duty of prudence by failing to take the other steps. Plaintiffs admitted as much at oral argument. *See* ECF No. 161 at 74 (conceding that the other alternatives are "entirely derivative of a disclosure action," so if plaintiffs "haven't adequately pled a disclosure claim," the other alternatives "fall with it").[1] The Court will therefore focus on the disclosure alternative.

## 2. Consistent with the Securities Laws

Defendants argue that early disclosure would have been inconsistent with the securities laws, because, they say, the securities laws do not *require* them to

---

[1] In fact, removing a fund as an investment option "without explanation might be even worse" than straight-up disclosure. *Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 864 (6th Cir. 2017). Removing a fund as an investment option without explanation "signals that something may be deeply wrong inside [the] company" without giving the market enough "information to gauge the stock's true value." *Harris v. Amgen, Inc.*, 788 F.3d 916, 925-26 (9th Cir. 2014) (Kozinski, J., dissenting from denial of rehearing en banc).

"immediately" disclose "all information that might conceivably affect" Wells Fargo's stock price. ECF No. 115 at 18 (quoting *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 27 (1st Cir. 2012)). But defendants do not argue that early disclosure would have *violated* any "provision of the securities laws." ECF No. 161 at 100. This is not surprising, as one of the main goals of the securities laws is to curb fraud and insider trading. Thus, an early disclosure of Wells Fargo's unethical sales practices would have been consistent with both the letter and the spirit of the securities laws.

### 3. More Harm Than Good

The problem for plaintiffs is the third *Dudenhoeffer* requirement—viz., the requirement that they plausibly allege that "a prudent fiduciary in the defendant's position could not have concluded that . . . publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Dudenhoeffer*, 134 S. Ct. at 2473.

This is a "fact-sensitive inquiry." *Harris v. Amgen, Inc.*, 788 F.3d 916, 926 (9th Cir. 2014) (Kozinski, J., dissenting from denial of rehearing en banc). The fiduciary's decision should not be "evaluated from the 'vantage point of hindsight.'" *In re Target Corp. Sec. Litig.*, No. 16-CV-1315 (JNE/BRT), 2017 WL 3267708, at *19 (D. Minn. July 31, 2017) (quoting *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994)). And a

prudent fiduciary may—indeed, must—consider numerous factors in determining whether disclosure would cause a fund more harm than good.

For example, just how serious is the alleged fraud? *See Smith v. Delta Air Lines Inc.*, 619 F. App'x 874, 876 (11th Cir. 2015) (dismissing a complaint that did not allege that "the fiduciaries had material inside information about [the company's] financial condition"). How much would disclosure affect the company's stock price in the short run? How about in the long run? *See Harris*, 788 F.3d at 926. How many shares of company stock does the Plan currently own? How many additional shares will Plan participants purchase if disclosure is delayed for a month? Or a year? *See In re Pilgrim's Pride Stock Inv. Plan ERISA Litig.*, No. 2:08-CV-472-JRG-RSP, 2016 WL 8814356, at *3, *report and recommendation adopted*, ECF No. 203 (E.D. Tex. Oct. 4, 2016) (rejecting the plaintiffs' argument that earlier disclosure would have been better for the fund partly because "[t]he million-plus shares already in the Plan dwarf the small number that would have been added in any given month by contributions to the Plan").

Then there are factors that relate to the *timing* and *form* of any disclosure. *See Harris*, 788 F.3d at 926 (noting that a "badly timed withdrawal could cause the stock value to drop below its efficient-market level"). How confident is the fiduciary that he or she has all relevant information, so that a single complete and accurate disclosure can be made? Should the fiduciary wait to get more information before disclosing the fraud

-11-

so as to avoid a piecemeal "releas[e of] a disparate array of half-truths and incomplete data to the market"? *Id.* at 927.

Should the fiduciary wait until the company's fraud can be disclosed simultaneously with some remedial action, such as a settlement with the SEC, the resignation of the company's CEO, or the rollout of a new company initiative to win back its customers' trust?  Being able to pair an announcement of fraud with an announcement of remedial action may cushion the bad news and thus mitigate the drop in the stock price.  Also, would it be more beneficial to disclose the fraud through normal channels rather than through the fiduciaries of a 401(k) plan?  *See Graham v. Fearon*, No. 1:16 CV 2366, 2017 WL 1113358, at *5 (N.D. Ohio Mar. 24, 2017) (observing that "an 'unusual' disclosure outside the securities laws' normal reporting regime could 'spook' the market, causing a more significant drop in price than if the disclosure were made through the customary procedures" (quoting *In re BP P.L.C. Sec. Litig.*, No. 4:10-CV-4214, 2017 WL 914995, at *5 (S.D. Tex. Mar. 8, 2017))).

This list of considerations is not exhaustive, of course.  But it is sufficient to make the point that an earlier disclosure is not always better than a later disclosure.  A dozen fiduciaries in the same position could weigh the same factors and reach a dozen different (but equally prudent) conclusions about whether, when, how, and by whom negative inside information should be disclosed.

Perhaps for that reason, most post-*Dudenhoeffer* cases have come down on the side of the defendants.[2]  For example, in *Loeza v. John Does 1-10*, 659 F. App'x 44 (2d Cir. 2016), a group of JPMorgan employees argued that the fiduciaries of JPMorgan's 401(k) plan acted imprudently by failing to disclose fraud to the public.  There, as here, the plaintiffs claimed that earlier disclosure "would not have caused the Fund more harm than good because 'the longer a fraud goes on, the more painful the [stock price] correction would be, as experienced finance executives . . . reasonably should have known.'"  *Id.* at 45-46 (citation omitted).  The Second Circuit, however, held that these allegations were "wholly conclusory and . . . insufficient" to meet *Dudenhoeffer*'s pleading standard.  *Id.* at 46.

Similarly, in *Saumer v. Cliffs Natural Resources Inc.*, 853 F.3d 855 (6th Cir. 2017), the plaintiffs claimed that plan fiduciaries should have divulged inside information about the company "so that the market would correct downward and the fiduciary would cease buying [the employer's] stock at an inflated price."  *Id.* at 863.  But disclosing this information "would have collapsed [the employer's] stock price, hurting participants

---

[2]Two notable exceptions are *Murray v. Invacare Corp.*, 125 F. Supp. 3d 660, 667-69 (N.D. Ohio 2015) and *Ramirez v. J.C. Penney Corp.*, No. 6:14-CV-601-MHS-KNM, 2015 WL 5766498, at *4-5 (E.D. Tex. Sept. 29, 2015).  But *Murray* relied heavily on a Ninth Circuit decision that was later reversed by the United States Supreme Court in *Amgen Inc. v. Harris*, 136 S. Ct. 758, 759-60 (2016).  And *Ramirez* likewise predated *Amgen*.  *See Graham v. Fearon*, No. 1:16 CV 2366, 2017 WL 1113358, at *4 & n.5 (N.D. Ohio Mar. 24, 2017); *In re BP P.L.C. Sec. Litig.*, No. 4:10-CV-4214, 2017 WL 914995, at *3 & n.7 (S.D. Tex. Mar. 8, 2017).

-13-

already invested in the" fund. *Id.* at 864. Therefore, the Sixth Circuit rejected the "plaintiffs' nonpublic-information claims." *Id.* at 865. Similarly, in *Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016), the Fifth Circuit held that a prudent fiduciary "could very easily conclude" that early disclosure of BP's past safety breaches "*would* do more harm than good" to the plan. *Id.* at 529.

Courts have even dismissed breach-of-prudence claims when plaintiffs have made quite specific allegations about the likely impact of disclosure on the plan. For example, in *Forte v. U.S. Pension Committee*, No. 15-CV-4936 (PKC), 2016 WL 5922653 (S.D.N.Y. Sept. 30, 2016), the plaintiff alleged that "purchasers, who were harmed, outnumbered the sellers, who benefitted, by more than two to one." *Id.* at *5. That specificity did not satisfy the district court, which dismissed the plaintiff's claim on standing grounds but faulted the plaintiff for failing to "plead any facts to support his broad contention that 'in virtually every fraud case, the longer the fraud persists, the harsher the [price] correction tends to be.'" *Id.* at *10 (citation omitted). Similarly, in *Graham*, the plaintiffs alleged that disclosure "near the very beginning of" the fraud would have avoided "almost all of the artificial inflation of [the employer's] stock price that occurred" while harming "virtually no Plan participants." *Graham*, 2017 WL 1113358, at *5. And in *BP*, the plaintiffs offered expert analysis stating that an earlier disclosure "would likely have resulted in" a mere 3 to 5% drop in the stock price,

-14-

instead of the nearly 50% drop that later occurred after the April 2010 Deepwater Horizon explosion.  *BP*, 2017 WL 914995, at *4-5 (citation omitted).  Yet in both *Graham* and *BP*, the courts dismissed the plaintiffs' prudence claims because the plaintiffs had failed to plausibly allege that a prudent fiduciary *could not* have concluded that disclosure would have caused the plan more harm than good.

Plaintiffs argue that their case is different because it involves fraud that was ongoing at the time that defendants failed to disclose.  Ongoing fraud is certainly one factor that a prudent fiduciary might consider in deciding whether early disclosure would better protect the plan's assets; after all, disclosing the fraud will usually end the fraud, and less fraud will usually mean less damage to the company.  But ongoing fraud is not a talisman that will always satisfy *Dudenhoeffer*'s pleading standard.  Rather, it is simply another "factor[] [that] Defendants might have considered when deciding whether to make" an earlier disclosure.  *In re JPMorgan Chase & Co. ERISA Litig.*, No. 12-CV-4027 (GBD), 2016 WL 110521, at *4 (S.D.N.Y. Jan. 8, 2016), *aff'd sub. nom. Loeza v. John Does 1-10*, 659 F. App'x 44 (2d Cir. 2016).  Here, the alleged presence of ongoing fraud does not save plaintiffs' prudence claim for at least two reasons:

First, other courts have rejected similar ongoing-fraud claims.  In *Martone v. Whole Foods Market, Inc.*, No. 1:15-CV-877 RP, 2016 WL 5416543 (W.D. Tex. Sept. 28, 2016), for example, the plaintiffs alleged that Whole Foods' grocery stores

-15-

"systematically overcharg[ed] customers for pre-packaged foods." *Id.* at *1. This fraud went on for years. *Id.* And like plaintiffs here, the plaintiffs in *Whole Foods* alleged that the negative impact of Whole Foods' fraud "w[ould] only get worse the longer the fraud goes on." *Id.* at *8. Even so, the court dismissed the plaintiffs' claims, reasoning that "a prudent fiduciary could very easily conclude that [corrective] actions would do more harm than good." *Id.* (quoting *Whitley*, 838 F.3d at 529).

At oral argument, plaintiffs tried to distinguish *Whole Foods* by arguing that the fraud in that case was not as bad as the fraud here. *See* ECF No. 161 at 47-49. Specifically, plaintiffs claimed that the fraud in *Whole Foods* did not go to the "core of the company's business," while the fraud here went to the core of Wells Fargo's "reputation" for putting its "customer[s] first." *Id.* at 49. The Court disagrees. A grocery store's systematic overcharging of its customers is as serious a matter as a bank's overly aggressive cross selling.

Second, and more importantly, a fiduciary's prudence or imprudence must be assessed in light of the "*totality* of the circumstances." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 368 (4th Cir. 2014) (emphasis added; hyphens removed); *see also Dudenhoeffer*, 134 S. Ct. at 2471 (describing this inquiry as "necessarily . . . context specific"). The presence of ongoing fraud may weigh in favor of earlier disclosure. But other factors may weigh in favor of later disclosure. In this case, for example, a large

percentage of the Plan's assets was already invested in Wells Fargo stock. A prudent fiduciary might have concluded that, although delaying disclosure would result in a relatively small number of shares of overpriced Wells Fargo stock being added to the Plan, delaying disclosure would nevertheless benefit the Plan because it would allow the company to make a more complete and accurate disclosure, to pair a disclosure with an announcement of remedial measures, and to disclose through regular corporate channels rather than through 401(k) fiduciaries—all of which would help to mitigate the impact of disclosure on the price of Wells Fargo stock. *See Harris*, 788 F.3d at 926-27; *Graham*, 2017 WL 1113358, at *5.

In short, plaintiffs' prudence claim largely rests on their conclusory assertion that early disclosure of corporate misconduct is *always* better for a plan than later disclosure. That assertion is simply not true, as multiple courts have recognized. Plaintiffs have failed to plead specific facts to make plausible their allegation that, under the circumstances of this particular case, a prudent fiduciary "could not have concluded" that a later disclosure would result in a smaller loss to the Fund than an earlier disclosure. *Dudenhoeffer*, 134 S. Ct. at 2473. Plaintiffs' prudence claim must therefore be dismissed.

### B. Duty of Loyalty

An ERISA fiduciary is required not only to act with prudence, but also to act with loyalty—that is, "solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(1)(A)(i). In their briefs and then at oral argument, plaintiffs insisted that they pleaded a breach-of-the-duty-of-loyalty claim that was independent from their breach-of-the-duty-of-prudence claim. In other words, plaintiffs argued that even if their prudence claim were to be dismissed under *Dudenhoeffer*, they should be permitted to proceed with their loyalty claim.

In fact, though, the amended complaint does not clearly separate these two claims—that is, it does not clearly explain how, say, defendants' failure to make an earlier disclosure of the unethical sales practices could violate their duty of loyalty even if it did not violate their duty of prudence. The Court will therefore dismiss plaintiffs' loyalty claim with leave to replead the claim in a second amended complaint. If plaintiffs replead their loyalty claim, they should specify exactly who breached his or her duty of loyalty, exactly when, and exactly how. After that, defendants may move to dismiss the claim. The Court can then decide whether *Dudenhoeffer*'s pleading requirements apply to a loyalty claim that is predicated on the same facts as a (dismissed) prudence claim.

*C. Fiduciary Status*

Defendants argue that Wells Fargo, the Plan administrators, and the Human Resources Committee were not ERISA fiduciaries. Nothing seems to turn on this argument as a practical matter. In any event, the Court need not reach this question as to plaintiffs' prudence claim because that claim is being dismissed under *Dudenhoeffer*. If plaintiffs replead their loyalty claim, defendants may reassert this argument in moving to dismiss that claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss plaintiffs' amended complaint [ECF No. 113] is GRANTED.

2. Plaintiffs' amended complaint is DISMISSED WITH PREJUDICE, except that plaintiffs' claim that defendants breached their duty of loyalty under ERISA is DISMISSED WITHOUT PREJUDICE.

3. Plaintiffs may file a second amended complaint by Friday, October 27, 2017, in which they may replead their loyalty claim.

Dated: September 21, 2017        s/Patrick J. Schiltz
                                 Patrick J. Schiltz
                                 United States District Judge